IN THE DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-02504-PSF-CBS

DAVE A. BOONE,

      Plaintiff,

v.

MVM, Inc., a California corporation that does business in Colorado,

      Defendant.

---

## PLAINTIFF'S AMENDED RESPONSE TO DEFENDANT

## MVM, Inc.'s MOTION FOR SUMMARY JUDGMENT

---

### Background to Amended Response

Plaintiff filed his Response to Defendant MVM Inc.'s Motion for Summary Judgment on June 15, 2007 (Doc. # 87). In response to Mag. Judge Shaffer's Order dated May 10, 2007 (Doc # 80), on June 25, 2007, defendant filed its Notice In Response to the Court's Order of May 10, 2007 ("Notice") (Doc. # 96). In connection with this Notice, defendant filed as Exhibit C, under seal, formerly classified portions of its Contract with its government Client (referred to herein as "**Notice, Ex. C**"). This Amended Response references certain portions of the Contract that were formerly classified and that are now filed under seal as Exhibit C to defendant's Notice (see Minute Order dated July 12, 2007, doc. # 105). This Contract bears MVM Bates Nos. MVM0586 – MVM0627. References to this Contract are as follows: "**Notice, Ex. C**" or, if a specific page is referenced, "**Notice, Ex. C (MVMxxxx)**."

As a courtesy to defense counsel, a redline copy of this Amended Response has been provided by email showing changes from the original Response.

## Amended Response

Plaintiff, Dave A. Boone, through undersigned counsel, Responds herein to MVM Inc's. Motion for Summary Judgment (Doc. 79) and Memorandum of Points and Authorities in Support of Defendant MVM INC.'S Motion for Summary Judgment (Doc. 79-2).

Plaintiff's Exhibits are attached and shown in the Index to Plaintiff's Exhibits. Defendant's Exhibits were filed with defendant's Motion for Summary Judgment. Plaintiff's Exhibits are numbered as in 1, 2, . . . n, and are referenced as in **Ex. 1**. Defendant's Exhibits are identified with the letter A followed by a number as in A-1, A-2, . . . A-n, and are referenced as in **Ex. A-1**.

Terminology used in this Response is shown in **Ex. 2** and selected actors and the chain of command are shown in **Ex. 3**.

## I. INTRODUCTION

In March 2004, MVM acquired a very lucrative Contract with a classified agency (MVM's "Client") of the U.S. government to provide personal security protection to high ranking MVM Client personnel and their visitors in Baghdad, Iraq.  **Ex. 5**, **Notice, Ex. C**. This was the origin of the Scorpion PSD, or Personal Security Detail, Team.  The

government calls team members "DPPOs, or Drivers and Personal Protective Officers. Team members were armed and highly paid at the rate of $806 per day. MVM is one of a growing number of private military contractors. The Scorpion Team was fully funded through the U.S. government agency by American taxpayer dollars.

Michael Pietragallo was the Team Leader of the Scorpion PDS Team in Baghdad from August to December 2004. Five team members reported to Pietragallo. They were Dave Boone, plaintiff, TK Smith, Tony Romanzo, Oscar Hinojosa and Micky Johnson. Pietragallo reported to Louis Sengebush, program manager at MVM's office in Virginia. Sengebush reported to Jack Taylor, V.P. and had a parallel reporting relationship to Bruce Tully who was the acting overseas director and "the 'expert guy' on protective operations." Tully Depo. 43:22-24. These individuals reported to David Westrate, Sr. V.P. and Chief Operating Officer, who reported to the CEO, founder and principal owner of MVM, Dario Marquess, Jr. Taylor Depo. 30:11–24.

Pietragallo was a former Naval flight officer and in his deposition he recited the Navy Code of Conduct: "I will not lie, cheat or steal nor tolerate those among us who do." Pietragallo Depo. 24:11-15.

The Navy Code of Conduct did not govern the behavior of the Scorpion Team. MVM Standards of Conduct did. **Ex. 9**, p. 3. Among other activities, the MVM Standards of Conduct prohibited "dishonesty," "violation of MVM or client policies" and "fraternization." **Ex. 9**, p. 3, ¶¶ 6, 20 and 24. Finally, the MVM Standards of Conduct required MVM personnel to report violations by others of the Standards of Conduct, and

contained an implied promise that the person making such a report would not be retaliated against. **Ex. 9**, p. 3, ¶ 29 and Pietragallo Depo. 283:4–12. Distilled to their most basic fundamentals, the MVM Standards of Conduct are summarized and restated in the Navy Code of Conduct.

For refusing to tolerate those on the government funded Scorpion Team who did "lie, cheat and steal," and for reporting such lying, cheating and stealing, Boone, who Tully called a "patriot" (Tully Depo. 55:7–8) was fired.

MVM would like the Court to believe that "this is a case about an individual who was not retained as an independent contractor because he was a divisive personality on a job that demanded teamwork." Memo. p. 1. The reality is quite different.

This is a case about Dave Boone, an employee of MVM who was fired in retaliation for his exercise of his legal, contractual and ethical duties in reporting a false AAR[1] that was sent to the government, an affair between a Scorpion Team member and a uniformed member of the Client's staff, and the acquisition and storage of illegal weapons by Scorpion Team members in Baghdad.

TK Smith and Tony Romanzo were the principal authors of the false AAR that Boone refused to endorse and it was they who were the team members that sought to have Boone fired. Additionally, it was Romanzo who was engaged in the alleged affair with a married military member of MVM's Client's staff. It was Smith, Romanzo and

---

[1]An Index to Exhibits is shown in Exhibit 1. Terminology, abbreviations, selected actors and chain of command are shown in Exhibits 2 and 3.

Hinojosa who participated in the acquisition and storage of illegal weapons.  Smith was the team leader who persuaded Pietragallo, who was on vacation stateside and not the team leader at the time, to recommend to MVM that Boone be fired.  MVM management went along with the recommendation of Smith and Pietragallo and Boone was fired.

Thus, as plaintiff stated in his Response to Defendant's Motion for Judgment on the Pleadings (Doc. 17 filed 3/27/06), "[t]his is a case of betrayal."  Betrayal not only by the management and owners of MVM that hired Dave Boone to work on a classified federal government program and asked him to put his life on the line for the officials he was charged with protecting; but also betrayal by some of his very teammates who he supported and rendered aid to in the immediate aftermath of the suicide bombing on November 20, 2004.

John Hickman testified in his deposition that because the entire progam was tax payer funded, MVM and Scorpion Team members were holding positions of public trust. Hickman testified that if Mr. Boone believed that "there were unprofessional, unethical, and illegal acts being conducted [Boone had] a duty to bring that to MVM's attention." Hickman Depo. 100:17–25 and 101:1–5.  This is consistent with Boone's letter to MVM's CEO, Dario Marquez, dated April 14, 2005, that was never answered.  **Ex. 13**.

There are countless genuine issues of material fact, not the least of which are the nature of the employment relationship between Boone and MVM and the reasons

for Boone's termination.  Therefore, MVM's Motion for Summary Judgment should be denied.

## II.  FED. R. CIV. PROC. 56(C) STANDARDS

Defendant seeks summary judgment on all of plaintiff's claims.  Fed.  R.  Civ. Proc.  56(c) provides that summary judgment may be granted where there is "no genuine issue as to any material fact."  In evaluating a motion for summary judgment, the court should review "the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party . . . To avoid summary judgment, the party opposing the motion must establish, at a minimum, an inference of the existence of each essential element to the case." *Foster v. Alliedsignal, Inc.* 293 F.3d 1187, 1192 (10th Cir. 2002) (citations omitted).  "At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth but to decide whether there is a genuine issue for trial . . . The court must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *TPLC, Inc. v. United Nat. Ins. Co.*  44 F.3d 1484, 1489 (10th Cir. (1995) (citations omitted).

## III.  MVM'S STATEMENT OF UNDISPUTED MATERIAL FACTS

For the purposes of this Response to MVM's Mot. for Sum. Judg., plaintiff neither accepts nor rejects MVM's Statement of Undisputed Material Facts appearing on Memo. p. 3 – 12.  As discussed in the following sections, many of what MVM referrs to as "Undisputed Material Facts" are, in fact, very much disputed and others are not

material.  Such facts as are applicable and material will be addressed in the sections that follow.  Even if an "Undisputed Material Fact" is not discussed, it is disputed.

## IV.  GENUINE ISSUES OF MATERIAL FACT

**1.  *Does Colorado control*?  Yes.**

**From 2001 and continuing, Boone resided in Colorado whenever he was not deployed.  Boone was hired by MVM in February 2004 while he was at his home in Colorado, and was fired by MVM in January 2005 while he was at his home in Colorado.  Boone has suffered damages in Colorado.  Boone conducted business in Colorado and maintained bank accounts in Colorado and is married to a Colorado resident.**

**MVM does business in Colorado.  Boone filed suit in District Court for Adams County, Colorado.  MVM removed the suit to federal District Court in Colorado, not Virginia where MVM has an office and where MVM's counsel offices.**

**For these reasons, Colorado has the most significant relationship to this case and therefore Colorado law controls.**

## Analysis

MVM hinges its argument that Virginia law controls on its argument that the ICA is valid and controls and that therefore its choice of law provision (Virginia) controls.  Memo.  p.  14.  In contrast, for the reasons set forth in following sections, Boone argues that not only was the ICA not valid from the outset, but it was terminated in July 2004 when Boone resigned and was read-off the Scorpion Team.  In August 2004 Boone

was rehired by MVM but no new independent contractor agreement was signed. Therefore, because the ICA was either (i) not valid from its inception, or (ii) because it was terminated in June 2004 and not renewed, the ICA did not apply at the time of Boone's termination in January 2005.  Boone was at his home in Colorado in January 2005 when he was fired.

In a diversity action such as this, the "substantive laws of the forum state," here, Colorado, "including its choice of law rules," should be applied.  ***Elliot v. Turner Const. Co.*** 381 F.3d 995, 1001 (10th Cir. 2004).  "Under Colorado's choice of law rules, the law of the state with the most significant relationship to the claims will be used." ***Id***. Where a conflict of laws question is raised, the objective of the Restatement ( Second ) is to locate the state having the "most significant relationship" to the particular issue.  "In analyzing which state has the most significant relationship, the principles set forth in Restatement (Second) sections 6 and 188 are to be taken into account.  Once the state having the most significant relationship is identified, the law of that state is then applied to resolve the particular issue."  ***TPLC, Inc. v. United Nat. Ins. Co.***, 44 F.3d 1484, 1490 -1491 (10th Cir. 1995) (footnotes deleted).  Factors to be considered include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." ***Id***.

Applying these considerations we find that:

### a. Place of contracting and place of negotiating the contract.

Two employment agreements were made between Boone and MVM, one in February 2004, and one in August 2004.  Both were made between Boone and MVM while Boone was at his residence in Colorado.  **Ex. 4**, ¶ 11.

### b. The location of the subject matter of the contract and place of performance.

Boone's duties were performed in Baghdad, Iraq.  This Court has previously held that Iraq has no interest in this employment dispute between Boone and MVM and therefor neither Iraq law or venue applies.  Order on Motion for Judgment on Pleadings (Doc. 60), p. 10.

### c. The domicile, residence, nationality, place of incorporation and place of business of the plaintiff.

At the time of the actions complained of, 2004 – 2005, Boone was domiciled in Colorado working for MVM in Baghdad.  For many years, Boone has routinely worked overseas.  Beginning in 2001, Boone maintained a residence in Westminster, Adams County, Colorado.  At the end of each overseas deployment, he returned to his residence in Westminster, Colorado.  In 2003 plaintiff was married to Jordan, a Colorado resident, in Adams County, Colorado, pursuant to an Adams County Marriage Certificate.  Throughout the years at issue in this case, 2004 and well into 2005, plaintiff and his wife maintained their residence at 3563 W. 112th Circle, Westminster, CO 80031.  During these years, plaintiff's wife was a full time higher education student in

Colorado.  Plaintiff's mail and paychecks from defendant were delivered to his
residence at 3563 W. 112th Circle, Westminster, CO 80031.  Plaintiff maintains bank
accounts in Colorado and has other business interests in Colorado.  Plaintiff was
employed by defendant while plaintiff resided in Colorado (Boone Depo. 6:25 and 7:1–5
and 22–24) and fired by MVM while he was at his home in Colorado.  **Ex. 4**.

MVM argues that Boone is a resident of Alaska in 2004.  Memo. p. 3, ¶ 2.  While
Boone owned land and the beginnings of a cabin in Alaska at this time, the cabin was
not habitable and remains under construction.  Boone did not live there.  **Ex. 4**, ¶ 16.
Boone also owned real estate in North Carolina.  This property was rented out and
Boone did not live here either.  During 2004-2005, the years at issue in this case,
Boone resided in Westminster, Colorado.

**d.  The domicile, residence, nationality, place of incorporation and place of business of the defendant.**

It is not disputed that MVM is a California corporation with a principal place of
business in Virginia.  Memo. p. 3, ¶ 1.  MVM admits that it provides "security services
and personnel to U.S. Government agencies throughout the U.S. and abroad" and that
it does (some) business in Colorado.  MVM's Answer to Amended Complaint (Doc. 1
(12/9/05)), ¶¶ 27 – 30.

MVM argues that Virginia law should control.  Memo. p. 18–19.  However, Boone
was hired by MVM by a telephone call to Boone at his home in Colorado and was fired
by a telephone call to him at his home in Colorado.  MVM reached out to Boone while
he was living in Colorado and therefore subjected itself to Colorado law.  Boone filed

his Complaint in Adams County, Colorado, and MVM removed it, not to Virginia, but to

Federal District Court for Colorado.  While the underlying actions complained of

occurred in Iraq, this Court has already ruled that Iraq has no interest in the outcome of

this employment dispute and that Iraq law does not apply.  Additionally, because MVM

has an office in Virginia, is a California corporation and does business throughout the

U.S. and overseas, MVM could argue that the law of any state other than Colorado

applies.  Boone maintained bank accounts in Colorado, returned to Colorado after each

deployment at issue here, and was married in Adams County, Colorado,  to a Colorado

resident.

MVM argues that because Boone filed taxes in Alaska and owns property there,

he is not a resident of Colorado.  During the 2004 – 2005 time frame at issue here,

Boone lived in Colorado.  In MVM's **Ex. A-7** Boone states that he should be contacted

at his Colorado address, 3563 W. 112th Cir., Westminster, CO 80031 and that the

nearest airport that he would use for deployment would be DIA.  Boone's MVM

earnings were paid to him at 3563 W. 112th Cir., Westminster, CO 80031.  **Ex. A-8**.

Boone's 2004 Form 1040 shows his home address to be a post office box in Fairbanks,

Alaska, a place where Boone did not live.   **Ex. A-1**.  The Court can take judicial notice

that not only is it impossible to live in a post office box, it is probably against Post Office

regulations.  However this tax return was not filed until the summer of 2005, it is not

signed or dated by Boone, and was not signed by his tax preparer until May 11, 2005.

This date is after Boone had left MVM.  Boone's IRS Form W-4 that he submitted to Triple Canopy shows his Alaska address.  **Ex. A-9**.  However, this form is dated September 27, 2005, long after Boone left MVM and is not relevant to the instant case.

In *Zivian v. Brooke-Hitching*, 28 P.3d 970 (Colo. App. 2001), the court was asked to determine residency for the purposes of municipal elections.  The defendant had left Colorado and worked in New York for over a year, had filed taxes in New York, voted in New York and had a New York driver's license.  *Id*. at 973–974.  The court held that this was not enough to defeat Colorado residency.  The court held that:

> The residence of a person is the principal or primary home or place of abode of a person. Principal or primary home or place of abode is that home or place in which his habitation is fixed and to which a person, whenever he is absent, has the present intention of returning after a departure or absence therefrom, regardless of the duration of absence.

*Id*. at 973.

Analogously, in the instant case, Boone maintained a residence in Westminster, Colorado from 2001 until the present.  Throughout this period, he served long deployments overseas, but at the end of each deployment he returned to Westminster.  Other than his temporary overseas deployments, Boone did not live anywhere else during this period, and always had the "present intention" of returning to Colorado.  Boone's home or place of "habitation" was therefore Westminster, Colorado.

Boone's principal contacts with MVM, from the initial employment agreement in early 2004 until he was fired in January 2005, were from his Westminster address.

After being fired by MVM, Boone continued to live in Westminster and suffered damages while living there.

In November 2005, Boone filed suit against MVM in Adams County, Colorado. MVM removed the suit to federal district court for Colorado, not Virginia, and filed its Answer and all subsequent pleadings in Colorado.  Even though MVM has a principal place of business in Virginia and its lead counsel are located in Washington, D.C., MVM has not made any attempt to remove this case to Virginia.

Based on all of the above fact, Colorado is the state that has the most significant contacts with this litigation, and therefor Colorado law should control.  *Ranger v. Fortune Ins. Co.* 881 P.2d 394, 395 (Colo. App. 1994) (in multistate tort controversies, Colorado has adopted the rule of applying the law of the state with the most significant relationship with the occurrence and parties).

**2.  *Is the ICA a valid and enforceable agreement that creates an independent contractor relationship*?  No.**

**The ICA was an adhesion contract that Boone had no choice to sign and no opportunity to review or seek legal counsel.  Like the CIS Employment Agreement that Boone was familiar with, he believed the ICA created an employment relationship under which he could only be terminated for good cause.  There was thus no meeting of the minds and the ICA should be deemed void.**

**The ICA is a sham agreement in that while it purports to create an independent contractor relationship between Boone and MVM, the facts and**

**circumstances under which Boone worked do not satisfy the tests for an independent contractor relationship.**

**Therefore, Boone was an MVM employee that could only be terminated for good cause, for violating MVM's Standards of Conduct.**

## Analysis

MVM hinges its entire Motion for Summary Judgment on its argument that the ICA represented a meeting of the minds of Boone and MVM, created a valid and enforceable independent contractor relationship, and controlled the relationship between Boone and MVM throughout 2004 and 2005.  Memo. p. 5, 6 and 13.  Boone disputes these assertions.

Whether a contract exists is a question of fact and the intention of the parties can rarely be resolved on summary judgment.  *James H. Moore & Associates Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 372 (Colo. App. 1994).

It is not disputed that in March 2004, Boone signed the ICA.  Memo. p. 7, ¶ 29. Boone testified that on March 25, 2004, at MVM's offices, as Boone was literally headed out the door "in a whirlwind" for deployment to Baghdad, he was presented with a stack of documents on a conference room table and was told to sign them where they were tabbed.  Boone Depo. 102:19–25; 103:1–5; 105:14–25.  He spent maybe three or four minutes on them.  Boone had no input into drafting the ICA and no negotiating power.  It was presented, with the other documents, on a take it or leave it basis.

"An adhesion contract is a contract drafted unilaterally by a party and forced upon an unwilling and often unknowing public for services that cannot readily be obtained elsewhere . . . [it is usually] a printed form contract and offered on a "take-it-or-leave-it" basis . . . [T]here must be a showing that the parties had greatly disparate bargaining power or that there was no opportunity for negotiation." *Ad Two, Inc. v. City and County of Denver*, 983 P.2d 128, 132 (Colo. App. 1999).  All of the elements of an adhesion contract are present, and therefore the ICA should be deemed an adhesion agreement.  "The remedies recognized for contracts of adhesion are to treat the contract as unenforceable or to excise from the contract that particular term. The recognized rationales for these remedies are usually stated in terms of unconscionability, violation of public policy, or lack of true assent." *Batterman v. Wells Fargo Ag Credit Corp.*, 802 P.2d 1112, 1116 (Colo. App. 1990).  Because MVM's ICA is an adhesion contract, it should be deemed void.

Even if MVM's ICA is not decreed void, because it is an adhesion contract, it should be strictly interpreted against MVM.  For example, MVM's choice of law provision stated in Section 12 of the ICA (Virginia law controls) (**Ex. A-5**) should thus be interpreted in favor of Boone.  Boone was in Colorado when he was hired.  He was in Colorado when he was fired.  He was a resident of Colorado.  It is reasonable to infer that he believed that any dispute with MVM would therefore be resolved in Colorado under Colorado law.  Alternatively, MVM's choice of law provision should be "excised" as it did not reflect the intent of the parties. *Batteman*, *supra*.

MVM argues that Boone had adequate time to review and understand the ICA. Memo. p. 5, ¶ 19.  However, according to Boone, "it was rushed."  The documents looked "fairly standard" to Boone.  In fact, the ICA looked like the Construction Security Monitor Program Employment Agreement that Boone had previously signed with CIS. Boone Depo. 119:12–16 and 120:3–15.  (The CIS Employment Agreement is attached to MVM's Memo. as **Ex. A-4**.)

In contrast to the ICA, the CIS Employment Agreement does not purport to create an independent contractor relationship, but creates an employment relatiohship that can only be terminated for cause.  **Ex. A-4**, §§ 2 and 15.  For example, the § 6 of the CIS contract specifies that Boone's employment shall be for "no less than one year" (**Ex. A-4**, p. 4 (also CIS 0048)), whereas ¶ 2 of MVM's ICA (**Ex. A-5**) specifies that the ICA shall "terminate on [its] first anniversary," i.e., a term of one year.  Boone testified that he never came to the end of a CIS (Heritage) employment contract that he was not asked to stay.  Boone Depo. 60:17–20.  In other words, absent good cause for dismissal, Boone expected the MVM employment to continue.

These are material differences between the expectations and understandings of Boone and MVM.  It is thus reasonable to conclude that Boone did not understand the document he was told to sign and had no choice but to sign and that there was no meeting of the minds as to the ICA.  "[W]hen parties to a contract ascribe different meanings to a material term of a contract, the parties have not manifested mutual

assent, no meeting of the minds has occurred, and there is no valid contract."

***Sunshine v. M. R. Mansfield Realty, Inc.***, 575 P.2d 847, 849 (Colo. 1978).

Boone also testified that in February 2004, while he was at his residence in Colorado, he had a telephone conversation with Taylor during which all of the salient terms of his employment with MVM were agreed to. Boone Depo. 94:19–24. It is reasonable to infer that from this series of conversations (Boone Depo. 94–96) that Boone and MVM reached an employment agreement that included the terms and conditions of his employment with MVM in Baghdad contingent only upon MVM receiving a contract award from the federal agency that became its Client. Boone Depo. 96:12–17. It is also reasonable to infer that once MVM brought Boone on board, that Boone believed that the paperwork that Boone signed, including the ICA, merely reflected the employment agreement that he had previously reached with MVM and was the same employment arrangement as Boone had with CIS.

Regardless of what MVM captioned its document or referred to Boone in this document, if Boone was treated as an employee and not as an independent contractor, then MVM did not follow its own writing, and this writing must be a sham.

Finally, Boone never agreed to Virginia law and believed from the outset that because he was hired in Colorado, that Colorado law controlled. In fact, Boone believed that the District Court for Adams, Colorado had jurisdiction and that is where he originally filed this case.

Because there has been no meeting of the minds on the substantive provisions of MVM's ICA, the agreement is void, or worse, is a sham agreement to protect MVM. *Sunshine*, *supra*. As discussed below, the ICA should be also held void because it did not create the independent contractor relationship that it purported to create.

**3. *Do the facts of Boone's work for MVM support MVM's assertion that he was an independent contractor*? No.**

**Because MVM controlled virtually all aspects of Boone's work and Boone was on-call 24/7, Boone's employment with MVM did not meet the requirements for being an independent contractor to MVM. The ICA should thus be deemed a sham agreement. Boone was therefore a contract employee that could only be discharged for violating the Standards of Conduct.**

### Analysis

Throughout its Motion for Summary Judgment, MVM argues that the ICA was a valid and enforceable agreement and under it Boone was an independent contractor to MVM, not an employee of MVM.

As discussed above, in early 2004, while Boone was at his home in Colorado, Boone and MVM reached an oral agreement regarding Boone's terms and conditions of employment. No mention was made of an independent contractor relationship. On the basis of this oral agreement, Boone accepted employment with MVM.

MVM has much to gain by claiming that Boone was an independent contractor and not an employee. For example, if Boone was an independent contractor, then

MVM would not be liable for his torts. ***Powell v. City and County of Denver, Colo.***, 973 F. Supp. 1198, 1202 (D. Colo. 1997).  If Boone was an independent contractor, MVM would avoid significant FICA and medicare tax withholding matching obligations and possibly overtime pay under the FLSA.  Finally, MVM hinges its entire Mot. for Summary Judgment on the language of its ICA.  If this Agreement is void or a sham, then MVM's Mot. for Summary Judgment must be denied.

MVM can't have it both ways:  MVM can't seek to make Boone an independent contractor for withholding tax purposes, and then treat him as an employee in fact.

MVM captions its agreement an "Independent Contractor Agreement."   This is not determinative of whether Boone is or is not an independent contractor.  **IRS Rev. Rul 87-41,1987-1 C.B. 296** Employment Status Under Section 530(D) of the Revenue Act of 1978, p. 4 ("special scrutiny is required in applying the twenty factors to assure that formalistic aspects of an arrangement designed to achieve a particular status do not obscure the substance of the arrangements").  IRS Rev. Rul. 87-41 is sometimes referred to as the "twenty-factor test."  Copy attached as **Ex. 15**.  These factors address whether "sufficient control exists to establish an employer-employee relationship." Bradley S. Abramson, ***The Colo. Lawyer***, Vol. 34, Dec. 2005, p. 53, 60.  While no one factor is determinative and the "totality" of circumstances must be considered, a "yes" answer to a majority of these factors indicates that the person is an employee, not an independent contractor.

The twenty-factor test under **Rev. Rul 87-41** reflects Colorado common law. The test for being an independent contractor revolves around the degree of direction and control the employer has over the individual.  The court asks: "Does the employer retain or have the right of control over the person as to all details of the work, or whether that rests solely with the person engaged? " *Dumont v. Teets*, 262 P.2d 734, 735 (Colo. 1953).  If control rests solely or mostly with the person engaged, then that person is an independent contractor.

Common law agency principles can be applied in determining whether an individual is an employee or an independent contractor.  Under Colorado law, "[s]ix factors are considered in making [this] determination: (1) the degree of control exercised by the employer over the work; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the business relationship; (5) the degree of skill the work calls for; and (6) the extent to which the work is integral to the employer's business." *Powell v. City and County of Denver, Colo.,* 973 F. Supp. 1198, 1202 (D. Colo. 1997).  The Colorado courts ask: "Does the employer retain or have the right of control over the person as to all details of the work, or whether that rests solely with the person engaged? " *Dumont v. Teets*, 262 P.2d 734, 735 (Colo. 1953).  If control rests solely or mostly with the person engaged, then that person is an independent contractor, if not, then that person is an employee.

Under the twenty-factor test, "the relationship of employer and employee exists when the person or persons for whom the services are performed have the right to

control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished." **Rev. Rul. 87-41**, p. 3.

"[T]he economic realities of the relationship govern, and the focal point is "whether the individual is economically dependent on the business to which he renders service ... or is, as a matter of economic fact, in business for himself." ***Dole v. Snell*** 875 F.2d 802, 804 -805 (10th Cir. 1989).

### The Twenty-Factor Test

Applying the twenty-factor test to the facts of Boone's employment, we find that MVM asserted the requisite control over Boone that is consistent with an employment relationship, not an independent contractor relationship.  Therefore, as shown below, Boone was an employee of MVM not an independent contractor:

**Factor 1, Instructions**:  Pietragallo testified that Boone and the other team members had to follow his directions and that they did not have the discretion to decide what to do.  That was Pietragallo's decision.  Pietragallo Depo. 112:1–20.  Pietragallo was designated by MVM as the team leader and he reported to Sengebush, who MVM did not call an independent contractor.  Boone did not have the requisite discretion to decide what he was going to do, when or how he was going to do it.  MVM controlled what Boone did, when he did it and how he did it.  The Statement of Work (SOW) in the Contract (**Ex. 5** (MVM 0559)) has been redacted out as classified.  However, it is reasonable to infer that MVM's Client dictated what had to be done thus leaving MVM

and the Scorpion Team little if any discretion.  As discussed below, team members had to be available on a 24/7 basis for whatever needs the Client might have.

**Notice, Ex. C**, ¶ 2.0.1 b) (MVM 0610) required that: "all [MVM] personnel are required to adhere to all applicable Sponsor [MVM's Client] field management rules and regulations regarding standard operating procedures, use of lethal force, *off-duty behavior*, and various administrative issues." (Emphasis added.)

**Notice, Ex. C**, ¶ 2.3 (MVM0611) provided that: "The Contractor [MVM] shall have sole responsibility for supervising, and managing its *employees* and will perform services as outlined in the Statement of Work (SOW)." (Emphasis added.)

MVM employees, such as Boone, had to conform to MVM's Client's standards of conduct and MVM's standards of conduct that were approved by MVM's Client.  **Notice, Ex. C**, ¶ 6.0 (MVM0615).

It is clear that Boone was required to follow directions, even as to his *off-duty behavior*, and standards of conduct set by his employer.  Independent contractors are not required to follow directions; employees are.  Under Factor 1, Boone was an employee.  Paragraph 2.3 of the Contract cited above referrs to MVM's "employees." This is consistent throughout the Contract.  The government believed that the personnel MVM was providing were MVM's employees, not independent contractors.

Under Factor 1, Boone was an MVM employee.

**Factor 2, Training**:  The Contract required MVM to provide personnel that are "fully trained . . . ."  **Notice, Ex. C**, ¶ 1.1 (1) (MVM0608).  "All Contractor personnel

should be <u>fully trained by the Contractor</u> . . .  the Sponsor will provide training guidelines and set standards for training compliance by the Contractor." **Notice, Ex. C**, ¶ 9.1 a) (MVM0618). (Emphasis original).  Finally, MVM was required to certify to the government that "each Contractor employee" had completed all training required by the government. **Notice, Ex. C**, ¶ 9.1 c) (MVM0619).  "False statements" regarding training "may be punishable under U.S. Code, Title 18, Section 1001." *Id.*

Independent contractors are not subject to training by their clients; employees are subject to training by their employers.  Here, MVM was required to provide extensive training to Boone and all Scorpion Team members and was required to certify to the government that it had provided such training.  Under Factor 2, Boone was an MVM employee.

**Factor 3, Integration**: Boone was an integral part of the MVM business of providing PSD personnel in Baghdad to the federal government, and was thus subject to MVM direction and control.  Under Factor 3, Boone was an MVM employee.

**Factor 4, Services Rendered Personally**: Boone was required to personally render PSD services.  Under Factor 4, Boone was an MVM employee.

**Factor 5, Hiring, Supervising, and Paying Assistants**: MVM hired, paid and supervised all Scorpion Team members and designated team leaders.  In the fall of 2004, Pietragallo was the team leader and Boone had to accept directions from him. Pietragallo Depo. 112:9–20.  Under Factor 5, Boone was an MVM employee.

**Factor 6, Continuing Relationship**: Boone's relationship with MVM was

continuous, at least in so far as his deployments were concerned.  During deployments, he could only work for MVM and was essentially on call 24/7 for his entire deployment. Pietragallo Depo.  287:17–21.  **Notice, Ex. C**, ¶ 2.0.1 a) (MVM0609).  Under Factor 6, Boone was an MVM employee.

**Factor 7, Set Hours of Work**:  MVM determined the hours of work.  Pietragallo Depo. 112:9–20 and 287:17–21.  MVM's Contract with its Client specified that, "[d]aily hours worked can be as few as eight to as many as 24, depending upon the site and the Sponsor dictated requirements."  **Ex. 5**, Contract, ¶ 2.0.1 a) (MVM 0560).  Under Factor 7, Boone was an MVM employee.

**Factor 8, Full Time Required**: Boone was required to work full time for MVM and did not have the option of working for anyone else, not only during deployments, but also during the 30 day home leaves that were intended for rest and recreation. Pietragallo Depo.  287:17–21. In response to a question posed by MVM's counsel on cross-examination, Sengebush, the program manager, testified that Boone was not free to work for anyone other than MVM.  Segenbush Depo. 230:5–9.  See also Factors 6 and 7 above.  "[T]he Contractor [MVM] must be able to respond to operational issues on a 24-hour-a-day, 7 days-a-week basis."  **Notice, Ex. C**, ¶ 4.1 (MVM0613).

Under Factor 8, Boone was required to be available 24 hours a day, 7 days a week.  He was an MVM employee.

**Factor 9, Doing Work on Employer's Premises**: All work was conducted on MVM's Client's premises in the Green Zone in Baghdad or within Client provided

vehicles escorting protectees to and from the Baghdad airport or other locations. **Notice, Ex. C**, ¶ 1.2 (MVM0608).  Under Factor 9, Boone was an MVM employee.

**Factor 10, Order or Sequence Set**: As shown in the analyses for preceding Factors, Boone was required to perform the work as he was directed by Pietragallo, the team leader, who reported to Segenbush in Virginia.  Under Factor 10, Boone was an MVM employee.

**Factor 11, Oral or Written Reports**: Pietragallo provided bi-weekly time sheets to MVM (Pietragallo Depo. 94:13–21).  The Contract required routine reports from MVM.  **Notice, Ex. C**, ¶ 10.0 (MVM0619).  Independent contractors are retained to provide a final product; employees provide routine reports of daily activities that are dictated by the Client and MVM.  Under Factor 11, Boone was an MVM employee.

**Factor 12, Payment by Hour, Week, Month**: Boone, along with the other team members, were paid on a daily basis.  Boone was paid $806 per day, seven days per week.  Pietragallo Depo.  95:18–22 and 96:1–5.  Boone was not paid on a per job or commission basis.  Boone's paychecks were routinely mailed to his home address in Colorado (and the monies direct deposited in his bank account in Colorado).  Under Factor 12, Boone was an MVM employee.

**Factor 13, Payment of Business and/or Traveling Expenses**: MVM paid all business and travel expenses from Boone's point of departure (DIA) and return.  Under Factor 13, Boone was an MVM employee.

**Factor 14, Furnishing of Tools and Materials**: MVM or its Client provided all of Boone's weapons, tools, equipment, lodging, food, transportation, etc.  Pietragallo Depo.  288:3–13; Boone Depo. 102:19–23.  The government or MVM provided all tools, equipment, weapons, vehicles, ammunition, lodging, and even clothing.  **Notice, Ex. C**, ¶¶ 7.1 and 7.2 and (MVM0616 – 0618).  MVM was required to provide "all services, facilities, training, materials, supplies, clothing and equipment required to comply with this SOW except as specifically provided in sections 7.1.1–7.1.3."  **Notice, Ex. C**, ¶ 7.2.1 (MVM0617).

Under Factor 14, Boone was an MVM employee.

**Factor 15, Significant Investment**: Boone made no investment in any facilities he used in providing PSD services.  Independent contractors normally make investments in their businesses; employees do not.  Under Factor 15, Boone was an MVM employee.

**Factor 16, Realization of Profit or Loss**: As stated above, Boone was paid $806 per day for seven days a week for all the days of his deployment.  He did not make any profit or loss.  Boone was not in business for himself as is required to be an independent contractor, but rather was economically dependent on MVM, just as an employee would be.  Under Factor 16, Boone was an MVM employee.

**Factor 17, Working for More Than One Firm at a Time**: Working for any employer other than MVM was prohibited.  As Segenbush testified, this would be a conflict of interest, even during times when Boone was not deployed.  Segenbush

Depo. 230:5–9.  It was also physically impossible because Boone was on-call 24 hours a day, 7 days a week, throughout his deployment.  His rotations home were for rest and relaxation, not work.  Under Factor 17, Boone was an MVM employee.

**Factor 18, Making Service Available to General Public**: Boone's PSD services were not available to the general public; they were only available to MVM.  An employee's services are not available to the general public, only to his employer. Under Factor 18, Boone was an MVM employee.

**Factors 19 and 20, Rights to Discharge and Terminate**: Under ¶ 2 of the ICA, MVM had the right to discharge Boone for a "material breach" of the agreement.  Also, under ¶ 2 of the ICA, the definition of "material breach" was limited to Boone and did not extend to MVM.  Thus, it is ambiguous at best whether, under the ICA, Boone had the right to terminate the agreement.  Under Factors 19 and 20, it is ambiguous at best as to whether Boone was an independent contractor or an MVM employee.

### Twenty-Factor Test Conclusions

As the results of the twenty-factor test above show, MVM exercised the requisite control over Boone that is required in an employee-employer relationship and absent in an independent contractor relationship.  Where the employer has the "right of control over the person as to all details of the work," that person is an employee, not an independent contractor.  ***Dumont***, *supra.* Boone was therefore an employee of MVM, not an independent contractor.  Because establishing an independent contractor

relationship was the central concept of the ICA, the ICA was a sham agreement and should be deemed void.

As noted in the following section, even the government believed that MVM's PSD personnel, such as Boone, were employees of MVM and MVM's Contract referred to them as "employees," not independent contractors.

MVM's Contract (**Ex. 5**) with the classified government agency contains the following requirements:

> The Contractor [MVM] shall comply with all applicable regulations, orders, policies, and procedures as referenced in this SOW, or as issued to the Contractor by the Contracting Officer (CO) and/or the Contracting Officer's Technical Representative (COTR).

**Ex. 5**, Contract, ¶ 1.2.1 (MVM 0560).

> all [MVM] personnel are required to adhere to all applicable management rules and regulations regarding standard operating procedures, use of lethal force, off-duty behavior, and various administrative issues . . . .

**Ex. 5**, Contract, ¶ 2.0.1 b) (MVM 0561)

These requirements are further evidence of the degree of control asserted by MVM and its Client over Boone and all members of the Scorpion Team.  Even their off-duty behavior was controlled and monitored.  No such requirements are imposed on an independent contractor.

Taken together, it is reasonable to infer that under U.S. Supreme Court holdings, Colorado common and statutory law, and Internal Revenue Service Rules, Boone was not an independent contractor of MVM, but rather was an employee of MVM.  Because

Boone was not an independent contractor of MVM, as MVM attempted to make him through the ICA, there was no meeting of the minds on the ICA's central material term. Thus, MVM's ICA is a sham agreement and void.  A contract that does not reflect a meeting of the minds is not valid.  ***Sunshine v. M. R. Mansfield Realty, Inc.***, *supra*. MVM's Independent Contractor Agreement should therefore be set aside as void.

As an employee of MVM, Boone maintains that, consistent with his experiences and expectations from the CIS Employment Agreement (**Ex. A-4**), and pursuant to the initial oral agreement with MVM and the custom and practices in the industry, Boone could only be terminated for good cause for violating its Standards of Conduct, or if MVM's underlying contract with the government was cut back or terminated.

**4.  *Did MVM's Client, an agency of the Dept. of Defense, consider Boone and the other PSD personnel, employees of MVM*?  Yes.**

**MVM's Contract with its Client, and correspondence from its Client, refers to PSD personnel, including Boone, as "employees."**

### Analysis

MVM's Contract with its Client referred to employees as did various government correspondence.  The Contract between MVM and its Client refers to "Contractor [MVM] employees."  **Ex. 5**, Contract § 5.2 (MVM 0565).  In two letters, one dated March 18, 2004 and the other dated November 9, 2004, Mr. Adlam of the Dept. of Defense refers to Boone as an "employee" of MVM, not a contractor of MVM.  **Exs. 6** and **7**. MVM's Client (which the Contract refers to as the Sponsor) is an "agency of the

Department of Defense." **Ex. 5**, § 1.2 (MVM 0559).  Thus, Mr. Adlam is speaking for MVM's Client, and thus for the federal government, when he refers to MVM personnel as "employees."  By attempting to classify its PSD personnel, such as Boone, as independent contractors and not as employees as the government specified and believed, is MVM perpetrating a fraud on the federal government?  Is MVM attempting to avoid paying withholding taxes?  By attempting to classify its PSD personnel as independent contractors, is MVM attempting to avoid tort liability for the acts or omissions of these individuals while they are deployed?

Paragraph 2.3 of the Contract states: "The Contractor [MVM] shall have sole responsibility for supervising, and managing its employees and will perform services as outlined in the Statement of Work (SOW)." **Ex. 5**.  The Contract does not refer to MVM's personnel as "independent contractors."  It consistently refers to them as "employees."  Among other places, MVM's "employees" are referred to in **Notice, Ex. C**, ¶¶ 1.4, 3.0 b), 3.2 d), 4.3, 5.1, 5.2 a), 5.2 d), 6.1 a), 6.1 b) and 8.0.

Based on MVM's Contract with its Client, the federal government expected that Scorpion Team members would be employees of MVM, not independent contractors.

Was MVM seeking to slip one past the government by attempting to make Boone and the other Scorpion Team members independent contractors via the ICA?  It is unlikely that the government would condone an arrangement where its contractor, MVM, received government funds to pay its PSD personnel, and then did not withhold taxes or pay its matching share of FICA and Medicaid, yet this is exactly what MVM

sought to do via its claimed independent contractor arrangement with Scorpion Team members including Boone.

**5.  _Even if the ICA was valid when signed, was it terminated by Boone's resignation and project read off in June 2004_?  Yes.**

**Because Boone resigned from MVM in June 2004, was read off the project and was looking for other work, the ICA, even if it was valid at its inception, was terminated.  Because no new ICA was entered into in August 2004, Boone's work for MVM thereafter was as an employee that could only be terminated for violating the Standards of Conduct.**

### Analysis

It is not disputed that Boone resigned from MVM in June 2004 and was "read off" the Scorpion project.  Boone Depo. 178:4–6, 21–23; Sengebush Depo. 52:23–25. Boone understood that the ICA, if ever valid, no longer applied after he was read off the project in July 2004.  Boone Depo. 180:5–18.  Michael Pietragallo, Boone's team leader during the September – December 2004 deployment agrees that Boone resigned and was read off the program in June 2004.  Pietragallo Depo. 103:3–10.  Lou Segenbush, the MVM operations manager for the Scorpion Team, testified that in July 2004 Boone resigned and was read off the Scorpion program.  Sengebush Depo. 53:17–25.  Boone testified that he had "resigned and actually was in the process of seeking other employment."  Boone Depo. 180:15–18.

MVM argues the technicality that because Boone did not provide "written notice" to MVM, the ICA did not terminate with Boone's resignation in June 2004.  Memo. p. 8, ¶ 39.  In fact, under the circumstances of Boone's resignation where there is no question that MVM had notice of his resignation and Boone was read off the project, the ICA does not require Boone to tender written notice.  Taylor, Adams, Romano, Sengebush, Preston, Smith, Hale and Wright all knew that Boone had resigned.  Boone Depo. 190:13–16, 22 and 191:1–4.  As Boone testified in his deposition:

Q (by MVM counsel):  So you actually read off the contract?

A (by Boone):  Yes sir.  I was gone.

Boone Depo. 178:21–22.

It is reasonable to infer that by resigning and being read off the project, Boone believed he had given MVM any notice that the ICA required.  "Reasonable inferences" are to be drawn "in the light most favorable to the nonmoving party."  **Foster**, *supra*.

Section 1 of the ICA, subheading "Term," states:  "Either party shall have the right to terminate this Agreement on an earlier date, **or** upon a Material Breach of this Agreement, effective immediately upon the delivery of notice of termination from the non-breaching party to the breaching party."  Five pages later in Section 11, "notice" is defined to be "in writing and if sent by registered or certified mail . . . ."  **Ex. A-5**.  (Emphasis added.)

First, the above clause is ambiguous.  Does it mean that either party can terminate the ICA before its specified one-year term for any reason, or does it mean

that there has to be a "material breach?"  Can either party or only one party be in

"material breach?"  As the next clause in the ICA states, the only circumstance

constituting "material breach" is a failure of Boone to "perform the Services in an

appropriate manner, in the discretion of MVM."  In other words, only Boone could have

been in "material breach" of the ICA, never MVM.  However, Boone testified that he

thought MVM was in "material breach."  Boone Depo. 189:12–18.  But the ICA itself,

which MVM wrote, does not permit MVM to be declared in "material breach."

Ambiguities should be resolved against the drafting party.  Boone testified that he does

not know what a "material breach" is – "It's kind of legalese."  Boone Depo. 188:12–13.

In any event, assuming Boone understood the nuisances of the ICA (a big

assumption as it was never explained to him by MVM, he was not advised to get

counsel, and he did not read it), it is unlikely that either Boone or MVM would have

given the other written notice.  Here, Boone made his resignation clear, and if that were

not enough, he was read off the project.  MVM knew that Boone could no longer work

for the Scorpion project.  Boone was looking for other employment.  It is reasonable to

believe that neither party believed that the ICA remained in effect after Boone was read

off the project in June 2004.  However, when Boone rejoined MVM in August 2004, new

independent contractor agreement was ever signed, nor was any addendum to the ICA

made between Boone and MVM that would reinstate its terms.  It is a question of fact

for the fact finder, not on a motion for summary judgment, but at trial, to determine the

meaning, import, and validity, if any, of the ICA.

**6.** ***Was Boone an at-will employee from August 2004 to his termination in January 2005***? **Yes.**

**When Boone was re-employed by MVM in August 2004, no new ICA was signed and he was thus hired as an at-will employee**.

## Analysis

As discussed above, in June 2004 Boone resigned from MVM, was read off the Scorpion Project and was looking for other work.  Nearly three months later, in August 2004, Boone was contacted at his home in Colorado by Segenbush or Taylor and asked if he (Boone) would like to return to MVM.  Boone accepted the offer and believed that he was "starting a new one [agreement] . . . "starting over . . . ."  Boone Depo. 174:7–8 and 17.  However, no new ICA was signed.  Memo. p. 8, ¶ 42.

Genuine questions of material facts are thus presented:  Even if the ICA from March 2004 was valid, was it terminated with Boone's resignation and read off the program in June 2004?  If it was terminated, did Boone come back to MVM as an employee that could only be discharged for good cause, as he believed from the original oral agreement in February 2004?

**7.   *What Rules of Engagement and Standards of Conduct applied to Boone and the other Scorpion Team members in Baghdad from September to December 2004*?**

MVM's government Contract required MVM to implement "Sponsor approved" Standards of Conduct.  MVM's Contract also specified Rules of Engagement.  Boone was fired for following MVM's Standards of Conduct and for adhering to the Client's Rules of Engagement.

### Rules of Engagement

MVM alleges that Boone was given a copy of the CENTCOM [Central Commend] Rules of Engagement (Memo. p. 5, ¶ 17) and then in the next paragraph alleges that Boone never saw the CENTCOM Rules of Engagement. (Memo. p. 5, ¶ 18).  MVM itself seems quite confused as to what rules of engagement applied to the Scorpion Team in Baghdad.

Boone testified that not only was he told that he and the Scorpion Team were subject to CENTCOM Rules of Engagement, Boone and the Scorpion Team were subject to CENTCOM control in all regards.  Boone Depo. 316:21–25, 317:19–25, and 318:6–16.

On February 20, 2007, at 5 PM, eight days before the close of discovery in this case, MVM produced the unclassified portions of its Contract with its Client.  **Ex. 5**.  The entire Contract, including what was previously classified, was produced on June 28, 2007, four months after the close of discovery on February 28, 2007.  **Notice, Ex. C**.

Portions of the Contract as originally produced, such as the Scope of Work, were

marked as classified and were redacted out.

Among other things, **Ex. 5**, ¶ 2.0.1 b) (MVM 0561) of the Contract specified that:

> all [MVM] personnel are required to adhere to all applicable
> management rules and regulations regarding standard operating
> procedures, use of lethal force, off-duty behavior, and various
> administrative issues . . . .

**Ex. 5**, p. MVM 0561, ¶2.0.1 b).

The rules of engagement for use of deadly force are found in ¶ 2.1.1 of the

Contract.  These are:

> Deadly force is defined as a degree of force that is likely or
> intended to cause death or great bodily harm . . . The use of deadly force
> is authorized only for the protection of one's self, Sponsor personnel and
> other persons under Sponsor auspices when threatened with death or
> serious injury and deadly force is necessary to prevent that harm. Deadly
> force is to be used only as  a last resort . . . If possible, all means on
> non-deadly force will be attempted before resorting to the use of deadly
> force.

**Ex. 5**, Contract, ¶2.1.1. (MVM 0561).  While all Scorpion Team members were required

by the Contract to "adhere" to these rules of engagement (Contract, ¶ 2.0.1 b)), Taylor

testified that he had never seen any rules of engagement.  Taylor Depo.  39:20-22.

**Standards of Conduct**

MVM's Contract with its Client specified that:

> The Contractor [MVM] shall ensure that all Contractor employees
> assigned to this contract fully understand and comply with all aspects of
> this SOW and the applicable contract.

**Ex. 5**, Contract, ¶ 6.1 a) (MVM 0566).

MVM's Contract with its Client also required that:

> The Contractor [MVM] shall be responsible for maintaining employee competency, conduct, appearance, and integrity; and shall be responsible for taking such disciplinary action, with respect to the Contractor's employees, as may be necessary.  The Contractor shall ensure that all Contractor employees adhere to Sponsor accepted standards of conduct and performance and that reflect credit on themselves, their employer, and the Sponsor.

**Ex. 5**, Contract, ¶ 6.1 b) (MVM 0566).

In conformance with this requirement, it is not disputed that in March 2004 Boone was given MVM's Standards of Conduct and told to conform thereto.  Memo. p. 5, ¶ 15.  In March 2004, immediately before Boone deployed to Baghdad, these Standards of Conduct were given to Boone as part of the MVM Employee Handbook. A copy of the title sheet and table of contents for the Handbook and MVM's Standards of Conduct is attached as **Ex. 9**.

MVM specified that its Standards of Conduct that they were "*vital*" and that they *must be observed by the Employee.*" **Ex. 9** (emphasis added).  MVM's Standards of Conduct are consistent with Boone's understanding of his employment relationship with MVM, and consistent with the CIS Employment Agreement (**Ex. A-4**) that Boone was familiar with and believed the ICA to be.  Boone understood that he would only be discharged for good or just cause from violating the Standards of Conduct.  This is what the CIS contract specified.  **Ex. A-4**, § 15.  These *vital* Standards of Conduct set forth actions that would "not be tolerated by MVM" and thus would constitute "just cause" for termination.  MVM chose this language, and it is not discretionary language – it is

mandatory language.  By its own mandatory language, MVM expected its employees to abide by *all* of its Standards of Conduct.  MVM should also be so bound.

Under the Standards of Conduct, behavior that MVM stated it will not tolerate included: "dishonesty;" "violation of MVM or client policies . . . or contract requirements;" "fraternization," and "failure to notify management of serious violations of the Standards of Conduct by any MVM employee."  **Ex. 9**, p. 3, ¶¶ 6, 20, 24 and 29.  The first line of the Standards of Conduct specifies that they are "vital guidelines that must be observed by the Employee."  It does not say "independent contractor," it says "Employee."  There is no dispute that these Standards of Conduct were given to Boone in March 2004. Memo. p. 5, ¶ 15.  Tully also was given the Standards of Conduct when he began work for MVM, and testified that these Standards are given to "every employee."  Tully Depo 72:8–14.  If Boone was an independent contractor and not an employee, as MVM now claims, there would have been no reason for these Standards of Conduct to have been given to Boone.

Boone testified that these Standards of Conduct were familiar from other employers that he had worked for and common throughout the industry.  Boone Depo. 120:13–17.  They are very similar to the CIS Standards of Conduct attached as Attachment B to the CIS Employment Contract.  **Ex. A-4**, p. CIS 0056–0057. Pietragallo testified that he was given a copy of these Standards of Conduct when he started working for MVM in July 2004.  Pietragallo testified that these are the Standards of Conduct that Boone, Pietragallo and all the Scorpion Team members were "bound

by." Pietragallo Depo. 277:7–20. Pietragallo testified that these Standards of Conduct were not only "reasonable" but also "common sense." Pietragallo Depo. 278:10–13.

Paragraph 29 of the Standards of Conduct states that it is a violation of the Standards of Conduct to, "[fail] to no notify management of serious violations of the Standards of Conduct by any MVM employee." **Ex. 9**, p. 3, ¶ 29. Violating the Standards of Conduct can lead to "discipline including immediate termination of employment." **Ex. 9**, p. 3. Pietragallo testified that this required team members to report violations of the Standards of Conduct, to him first and then to MVM upper management. Pietragallo Depo. 280:9–21 and 282:7–17.

Pietragallo also testified that if a report was made, there was an implied promise by MVM to the person making the report that the person making the report would not be retaliated against. Pietragallo Depo.279:14–22 and 283:4–12.

In the circumstances presented here, MVM's own *vital* Standards of Conduct that it required adherence to, should be taken as a "professional ethical code" that Boone was obligated to conform to. ***Rocky Mountain Hosp. and Medical Service v. Mariani***, 916 P.2d 519, 525 (Colo. 1996) ("A professional employee forced to choose between violating his or her ethical obligations or being terminated is placed in an intolerable position . . . "). The Contract itself recites that falsification of training reports "may be punishable under U.S. Code, Title 18, Section 1001." **Notice, Ex. C**, ¶ 9.1 c) (MVM0619).

MVM's Standards of Conduct along with CENTCOM Rules that Boone was also required to conform to, and federal law such as 18 U.S.C. § 1001(a), should be taken as statements of public policy.

**8.  *Was Boone justified believing that the official MVM AAR describing the November 20, 2004 suicide bombing was a fraudulent document, that Romanzo was having an affair, and that some members were harboring illegal weapons*? Yes.**

Neither Boone, Johnson or Pietragallo saw any enemy shooters, and other than Romanzo who continued to fire his machine gun indiscriminately into a residential building, no team member discharged his weapon.  Under these circumstances, it defies logic to believe the AAR that claims there were 30 enemy shooters, three enemy killed in action and seven enemy wounded in action.

Based on the information Boone had, it is reasonable to believe that Romanzo was engaged in an affair in violation of MVM's Standards of Conduct and endangering the Scorpion Team.  Boone was justified in reporting this to his team leader, Pietragallo, and when Boone was fired, to MVM headquarters.

Boone personally observed illegal weapons, AK-47s and hand grenades, and therefor had good cause to report that illegal weapons were being purchased and/or stored by Hinojosa, Smith and Romanzo.

### Analysis – the False AAR

There is no dispute that on November 20, 3004, on the Qadisiyah overpass within a half-mile of the first checkpoint into the Green Zone in Baghdad, the Scorpion PSD team that was traveling back to the Green Zone in two armored Ford Excursions

was attacked by a suicide bomber in a car (a vehicle borne improvised explosive device, "VBIED").  There is also no dispute that in the immediate aftermath of the bombing, Boone told one member of the team to "safe" his weapon and another member to "cease firing."  Memo. p. 9, ¶¶ 49–51.

MVM argues that Boone was removed because he was a "liability" to the Scorpion Team.  Memo. p. 21.  This is simply not supported by the evidence which overwhelming shows that the AAR was fraudulent and that Boone was fired because he opposed the fraudulent AAR, Romanzo's affair, and the acquisition and storage of illegal weapons by some team members.

There is no dispute that Smith and Romanzo wrote an AAR that Pietragallo approved.  Memo. p. 10, ¶ 55.  Finally, there is no dispute that when Boone saw the AAR, he told Pietragallo that he did not concur with the report.  Memo. p. 10, ¶ 58.

The disputes involve whether Boone was justified in refusing to concur with the AAR and whether Smith and Romanzo sought Boone's ouster in retaliation for Boone's refusal to concur.

Boone, age 51, is a retired professional soldier with 20 years service in the U.S. Army Special Forces.  He is highly trained, highly educated and highly decorated. **Ex. 8**.  Much of his training involved counter terrorism actions.  For example, in the mid-1980s he was a sniper in a "stay-behind" unit in West Berlin that in the event of a Soviet

invasion was to stay behind the Soviet front and "organize, equip, and lead indigenous forces against . . . Soviet or Warsaw Pact forces."  Boone Depo. 20:21–25 and 21:1–14.

When it came to warfare and terrorism, Boone knew what he was talking about. He was the most highly trained and experienced member of the Scorpion Team in the fall of 2004.  Pietragallo testified that he had "no problem getting along" with Boone and that he "trusted" Boone's tactical judgment.  Pietragallo Depo. 312:20–22 and 313:1–4. Sengebush testified that Boone was a "stand-up guy . . .professional, courteous . . . [and] honest . . . ."  Sengebush Depo. 35:21–25 and 36:1–15.  Taylor believed that Boone had an "impeccable service record" and that nothing Boone during his tenure with MVM would lead Taylor to believe that Boone was dishonest.  Taylor Depo. 36:18–24 and 37:1–7.  Tully testified that Boone was a serving as a "patriot."  Tully Depo.  55:7–8.

A copy of Smith and Romanzo's AAR is attached as **Ex. 10**.  Sengebush testified that this AAR was "MVM's official report to the [C]lient."  Sengebush Depo. 149:4–5. The AAR was therefore an official government report.

In substance, the AAR claims that after the detonation of the VBIED, the two Scorpion vehicles came to a stop and were attacked by "20-30 shooters" After a firefight, Scorpion Team members killed three enemy and wounded seven enemy. **Ex. 10**, p. 14.  The only Scorpion Team member who fired his weapon was Romanzo

who manned the machine gun in the rear of the follow vehicle. **Ex. 10**, p. 15, ¶ 4.  It is this report, and the claims of killing and wounding "enemy" that Boone took issue with.

Subsequently, Boone wrote his own report in which he describes the bombing, that after the bombing he traversed the 60 or more meters to the lead vehicle to help Pietragallo and Hinojosa and then returned across the same exposed highway to the follow vehicle, and that at no time did Boone see any enemy shooting.  **Ex. 11.** Pietragallo testified that Boone's run across 60m of exposed highway to render aid to Pietragallo and Hinojosa was the "honorable" thing to do.  Pietragallo Depo.  91:5–7.

Team member Mickey Johnson, a former air marshal and nearly 20 year police veteran, also subsequently wrote a report in which he concludes with the comment that, "I did not observe ANY other persons, armed or unarmed on any rooftops or in any other areas."  **Ex. 12**, p. 3.  Johnson testified that he did not see any shooters, that except for Romanzo, no one on the team discharged their weapon, and that Romanzo was firing into a residential apartment building.  Johnson Depo. 58:5–17, 59:13–17, 60:15–18 and 63:13–22.  Boone testified that Romanzo was firing into an "upscale" "residential" building.  Boone Depo. 475:22–25 and 476:1–17.  Indiscriminate firing such as this would violate the Rules for Use of Deadly Force specified in § 2.1.1 of the Contract.  **Ex. 5** (MVM 0561).  Tully testified that such indiscriminate firing would be a "gross violation" of accepted rules of engagement and would be "unsafe."  Tully Depo. 86:14–19.

Johnson also testified that at a bar in the Green Zone later in the evening that Smith was bragging about how many "enemy" they had shot and killed, even though Smith never discharged his weapon. Johnson Depo. 69:7–24. Pietragallo testified in his deposition that he did not see anyone shooting at anyone on the team. Pietragallo Depo. 208:19–21. Boone testified in his deposition as follows:

> Q: You did not see any hostile forces on the bridge or in the buildings or anywhere on November 20?
>
> A: No, sir.

Boone Depo. 477:22–24.

MVM argues that Boone was terminated because he "failed to engage the enemy and instructed" other team members not to do so. Memo. p. 9, ¶ 53. It is simply incredulous to believe that a 20-year Special Forces veteran, highly trained in anti-terrorism skills, would not engage the enemy – if there were any enemy to engage. The simple truth is that there were no enemy to engage and the AAR is, at best, puffery, and at worst, intentionally fraudulent and intended to elevate Smith and Romanzo in their own eyes and the eyes of others.

Tully testified that the November 20 action was a "major incident" and that after investigating the AAR to the extent that he could, that he came to the conclusion that there was no reason for him not to believe Boone's version of the facts. Tully Depo. 27:20–24; 28:1–14; and 33:8–15. Tully testified that in his professional opinion, the statements in the AAR just don't "ring," that don't fit with the facts Boone reported nor with the "damage reports." Tully Depo. 34:13–18. Tully also testified that Boone not

only was justified in coming forward with his complaint that the AAR was fraudulent, but that "there was nothing else Mr. Boone could have done" – that Mr. Boone acted with "courage." Tully Depo. 39:13–24 and 40:1–6.

As to Romanzo's alleged affair, Boone discussed it with Pietragallo.  Pietragallo testified that Boone believed that Romanzo was having an affair, but at a later time, "didn't seem to care."  Pietragallo Depo.  46:5–9.  Apparently Romanzo persuaded the woman who he was involved in to submit an application for employment with MVM on the Scorpion Team.  Hickman saw the resume and Romanzo's cover letter recommending her.  Hickman Depo. 102:20–25 and 103:1–12.  She was not qualified and the application and cove letter was shredded.  *Id*.  However, whether an affair occurred or not, if Boone had a good faith belief that an affair did occur, Hickman believed that Boone had a duty to report it to MVM.  Hickman Depo.  1–4.

The only weapons authorized Scorpion Team are listed in the Contract § 7.5.2 (**Ex. 5**, p. MVM 0569). Any other weapons were not authorized.

It was common knowledge that some team members were holding illegal weapons such as AK-47s and hand grenades.  In fact, Hinojosa purchases two ammunition cans of hand grenades while Pietragallo and Boone were in the car.  See generally Pietragallo Depo. p. 313–316.  Pietragallo knew that these were unauthorized and the Client had previously instructed the Team that there would be no unauthorized weapons.  Pietragallo Depo.  315:6-7 and 16–17.  Pietragallo directed Smith to take these grenades to the embassy EOD ("Explosive Ordnance Disposal) team for disposal

telling the EOD team that they had been found "in the course of a mission."  Pietragallo

Depo. 315:2–5.  Of course, that was a lie, one of many in this case.

**9.  _Did Boone have a legal and ethical duty under MVM's Standards of_**
**_Conduct to report the false AAR, Romanzo's affair and the acquisition and_**
**_storage of illegal weapons, and was Boone justified in believing that he would not_**
**_be retaliated for such reporting_? Yes.**

      **The Standards of Conduct require reporting of any "serious violations" of**
**the Standards of Conduct.  Based on Boone's experiences with MVM in**
**June–August 2004, where the wrongdoers were fired and Boone was invited back**
**to MVM, Boone did not expect to be fired in retaliation for reporting these**
**unethical and illegal behaviors.**

### Analysis

Under ¶ 29 of the Standards of Conduct, Boone had a duty to report to MVM

"serious violations" of the Standards of Conduct and failure to do so was grounds for

discipline up to and including termination.  **Ex. 9**, p. 3.  As stated above, Tully testified

that Boone was not only justified in coming forward with his complaint that the AAR was

fraudulent, but that "there was nothing else Mr. Boone could have done," and that Mr.

Boone acted with "courage."  Tully Depo. 39:13–24 and 40:1–6.  Further, Tully testified

that Boone was "correct" in bringing these matters to MVM's attention.  Tully Depo.

54:15–23.  According to Tully, Sengebush told or at least implied to Tully that some of

the team members "didn't like [Boone because Boone had] ratted on them" regarding

the AAR, the romantic affair and the illegal weapons.  Tully Depo. 40:22–24 and 41:1–7.

In referring to Boone being fired, Tully told Sengebush that, "you can't penalize people for telling the truth . . . it takes courage to do what he's [Boone] has done."  Tully Depo. 42:1–3.

Additionally, Tully determined, "strongly," that Pietragallo and Smith were "negligent, unprofessional, [and] dangerous to the mission and the operation thereof." Tully Depo. 42:21–24.

Hickman testified that if Boone had a good faith belief that the AAR was fraudulent that he had a "duty" to report that the MVM.  Hickman also testified that a romantic relationship between a team member and a member of the Client's staff was not acceptable and that if Boone had information about any such relationship he also had a "duty" to bring that information to the attention of MVM.  Hickman Depo. 50:15–25, 51:1–3 and 51:16–20.

Hickman believed that Boone was a threat to Smith, Romanzo and Hinojosa because these three were weak and not qualified while Boone knew what he was doing.  Hickman Depo.  75:15–25 and 76:1–6.  In fact, Hickman would have had "no reservations" in bringing Boone back into the program.  Hickman Depo. 70:2–6.  Boone was more qualified to be on the Scorpion Team that Smith, Romanzo, Hinojosa and Pietragallo.  Hickman Depo.  117:10–25 and 118:1–16.

\Amended Resp to MVM Mot for Sum Judg

Thus, it is not disputed that Boone had a duty to bring to MVM's attention, as he did, first through Pietragallo and then to MVM management, the false AAR, the romantic relationship and the illegal weapons.  There was no reason for Boone to believe he would be retaliated against with the loss of his job.

**10.  _Did TK Smith and Tony Romanzo persuade Pietragallo to recommend to MVM management that Boone should be fired_? Yes.**

**TK Smith and Tony Romanzo, the very Scorpion Team members who Boone reported for unethical and illegal behavior, were in control of the Scorpion Team in January 2005 and were successful in forcing plaintiff off of the Scorpion Team in retaliation for Boone's complaints of their unethical and illegal behavior.**

## Analysis

MVM continues to claim that Boone was fired because he "did not fit in."  If this is true, which Boone does not concede, then it raises the issue of: Why did Boone not fit in?  As Tully testified, you can't penalize someone for being honest.

Sengebush implied to Tully that some team members did not like Boone and did not want Boone on the Scorpion Team because Boone had "ratted" on them.  Tully Depo.  40:22–24 and 41:1–7.

MVM claims that Pietragallo called Sengebush, complained about Boone's failure to engage the enemy on November 20, 2004 (there was no enemy to engage, see discussion above) and wanted Boone removed.  Memo. ¶¶ 52–55.  However, a reading of Sengebush's testimony (Sengebush Depo. p. 84–87) reveals a witness

groping for words with a severe lack of memory and very confused about dates.  It reveals a very weak leader.  Pietragallo testified that Sengebush was not a decisive leader.  Pietragallo Depo. 163:8–13.  Thus, Sengebush's testimony is suspect.

Pietragallo testified that at the time he wrote the January 14 memo, he was a civilian at home on vacation.  Pietragallo Depo. 41:19–20.  And Pietragallo "resent[s] to this day having been put in this position" of having to give his opinion.  Pietragallo Depo. 163:2–7.  As to friction on the Scorpion Team in late November and early December 2004, Pietragallo testified that:

> [T]here was  friction on the team at that time.  I wouldn't even say between Mr. Boone and myself.   I would say there was friction between multiple members of the team for any given reason.   Alpha males, close quarters, stressful environment, any number of issues.   My resolution to the problem that I thought would work was time and distance.   Time and distance.   I was at the end of roughly five and a half months on the ground.   Mr. Boone was on the end of roughly 90 days on the ground.
>
> And it's hectic and it's fast paced and there are a lot of moving parts.

Pietragallo Depo. 42:9–20.

In any event, whatever the problems on the team were at this time (late November to early December 2004), Pietragallo thought they were "petty."  Pietragallo Depo.  148:8.  Pietragallo's solution was "time and distance."  Pietragallo Depo. 151:19.  Apparently, Pietragallo felt that whatever the concerns, they would solve themselves and he never talked to Boone about any of these concerns.  151:19–22 and 152:1–3.

Pietragallo and Boone left Baghdad on the same day (on or about December 9, 2004).  Both Boone and Pietragallo expected to rotate back to Baghdad in about 30 days.  Pietragallo testified that at the airport in Ammon, Jordan, he put his arm around Boone's shoulder and said "see you on the flip side."  Pietragallo Depo. 41:22 and 42:1–8.  Boone remember this incident this was: "The last time I saw him [Pietragallo] was in the Oman [Amman, Jordan] airport. He had his arm around my shoulder, telling me what an ass[2] I was, what a great job I had done, enjoy my break, and I'll see you on the other side." Boone Depo. 293:7–10.  It is clear that both Pietragallo and Boone expected to come back to Baghdad in January 2005 after their respective home leaves.

After Pietragallo left Baghdad in December 2004, TK Smith became the Scorpion Team Leader.  Pietragallo Depo.  43:11–13.  Apparently, in December and January Smith make numerous telephone calls to Pietragallo while Pietragallo was at home on leave, off the payroll and having no duties as to the Scorpion Team.  Pietragallo Depo. 155:11–20.  Calls were also being made to Sengebush.  Smith's message was that he and the others (presumably especially Romanzo) didn't want Boone back.  Contrary to Pietragallo's assertion in the fourth paragraph of his January 14 memo ("I have been approached by every member of the Team . . . ."), Pietragallo never talked to anyone other than Smith.  Pietragallo Depo. 155:14–15.

---

[2]Boone will testify that the actual word used by Pietragallo was "asset" and that this is a transcription error by the court reporter in the deposition transcript. The word, "asset," is consistent with the context of both Boone's and Pietragallo's testimony.

The upshot of all these calls was Pietragallo's January 14, 2005 memo.  At the time he wrote it, Pietragallo was on leave at home, had no need to know what was going on in Baghdad, and "didn't care."  Pietragallo Depo. 44:10–13.  The third paragraph is the operative paragraph:

> The most flagrant example that I can think of took place during and after the attack on our Team on Saturday, 20 November 2004. As you are very familiar with the specifics pertaining to the attack itself I will address Dave Boone's conduct. During the attack he told Tony Romanzo to "stop shooting" and (according to Tony) yelled at him when Tony told him to direct fire to the roof top. Dave also told Oscar Hinojosa to "safe his weapon" during the fire fight.

**Ex. 14**, Pietragallo Memo, January 14, 2005.

This paragraph directly attacks Boone's character and his performance immediately after the suicide bombing on November 20, 2004 and implies that Boone acted incompetently.  However, in his deposition, Pietragallo testified that he had no problem with Boone rendering assistance to Pietragallo and Hinojosa (Pietragallo Depo. 156:5–12) and "no issue" with Boone not firing because he didn't see a threat. Pietragallo Depo. 156:16–19 and 157:10–13. In fact, Pietragallo was "surprised" that anybody showed up that quickly to help.   Pietragallo Depo.  161:11-17.

Finally, Pietragallo testified that the third paragraph of his memo was not meant to imply that Boone acted inappropriately on November 20 nor that Boone was wrong. Pietragallo stated: I can't sit here today and say he [Boone] was absolutely wrong." Pietragallo Depo. 160:8–9 and 18–19.

It is quite clear from Pietragallo's testimony that he expected himself and Boone to be redeployed in January, that he did not believe Boone acted inappropriately during the November 20th action, and that Smith, and behind him, his sidekick, Romanzo, were the instrumental parties Boone's firing in January 2005.

**11.  _Were the scorpion Team members who were instrumental in Boone's termination, in particular TK Smith, Romanzo, Hinojosa and Pietragallo, qualified to be on the Scorpion Team_?   No.  _Did these individuals seek Boone's termination to cover-up not only their illegal behavior but their lack of qualifications_?  Yes.**

**The Scorpion Team members instrumental in forcing Boone's firing, in particular TK Smith and Tony Romanzo, were not qualified to be on the Scorpion Team in the first place and were later fired for dishonesty and lying on their applications.  Oscar Hinojosa was fired for failing the physical requirements specified in MVM's Contract, and Michael Pietragallo was demoted from team leader to team member.**

<u>Analysis</u>

John Hickman became Scorpion Program Director in May 2005.  He determined that he was going to clean house and make sure that all members of the Scorpion Team were qualified to be on it.  As Hickman put it, he was going to give Scorpion an "enema!"  Hickman Depo.  66:9 and 67:9–14.  Over the next couple of months, he did, and by the end of the summer Pietragallo had been demoted to team member and Smith, Romanzo and Hinojosa were gone.  To avoid the dangerous situations that

inadequate leadership was causing for the Scorpion Team, Johnson transferred to the Viper Team.  Hickman Depo.  81:1–3.

Hickman determined that because of an injury Hinojosa suffered in Gaza before coming to MVM, an injury that Pietragallo knew of because Pietragallo served with Hinojosa in Israel and Gaza, that Hinojosa was not medically fit to be on the Scorpion Team.  Hickman Depo.  77:18–25 and 78:1–12.  Hinojosa was also taking pain killing drugs which is not permitted for an armed PSD team member.  Hickman Depo. 79:15–25.

Regarding Romanzo, Hickman determined that he had had hip replacement surgery that he had not disclosed on his application to MVM and that Romanzo was a liar.  Therefore, Romanzo was pulled.  Hickman Depo.  83:2–25 and 84:1–5.

Hickman released Smith at the same time as Romanzo because Hickman had determined that Smith had "lied on his resume" about his experience, was causing "problems . . . downrange," had a "megalomania" leadership style, was weak, and when someone "challenged him tactically, that was his pushback."  Hickman Depo. 85:10–25, 86:1–25 and 87:1–15.

Hickman also reviewed Pietragallo's qualifications and found that Pietragallo was not qualified to be a team leader, although he was marginally qualified to be on the Scorpion Team.  Hickman put Pietragallo in retraining and demoted him from team leader to team member.  Hickman Depo. 71:23–25.

Hickman determined that from the outset neither Smith, Romanzo or Hinojosa met the Contract requirements for physical and medical condition and should never have been hired.  For example, these requirements are shown in **Notice, Ex. C**, ¶ 3.1 (MVM0612), ¶ 11.1 (MVM0620), and Attachment A, Physical Fitness Test (MVM0621). MVM was required to provide "personnel who fully meet the qualifications set forth" in the Contract.  **Notice, Ex. C**, ¶ 5.2 b) (MVM0614).  Based on Hickman's conclusions regarding Smith, Romanzo and Hinojosa (which Boone and others concur with), MVM violated its Contract with the government and therefore could be liable under ¶ 6.2 b) (MVM0616) ("Falsification of unlawful concealment, removal, mutilation, or destruction of official documents or records or concealment of material facts by willful omission from official documents or records.").

Long before Hickman did his investigation and fired Hinojosa, Smith and Romanzo, Tully had opined that they were unprofessional and not qualified to be on the Scorpion Team.  Tully Depo. 42:21–24.

It is reasonable to infer that the very individuals who sought Boone's ouster were threatened by Boone and persuaded Pietragallo and then Sengebush that Boone should be fired.  Not one of them survived six months and were all fired by Hickman in the summer of 2005 primarily for dishonesty.

## V.  ANALYSIS OF BOONE'S THREE CLAIMS FOR RELIEF

As discussed below, Boone can establish all of the elements of his three claims for relief.  In evaluating a motion for summary judgment, the court should review "the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party . . . To avoid summary judgment, the party opposing the motion must establish, at a minimum, an inference of the existence of each essential element to the case."  *Foster*, *supra*.

### First Claim for Relief

### Breach of Express or Implied Contract

Boone's First Claim for Relief states a claim for breach of express or implied contract.  Amend. Compl. ¶¶ 179 – 196.

To prove breach of an employment contract for a definite period of time, Boone must prove that (i) he and MVM entered into a contract for employment; (ii) which provided for employment for a definite period of time; (iii) that MVM fired Boone before that time expired; and (iv) that Boone substantially performed his duties.  C.J.I. 31:1.  The same elements are required to prove breach of an employment contract for an indefinite period of time requiring good cause for termination except that element (ii) is replaced with the provision that Boone could not be fired without good of just cause.  C.J.I. 31:3.

Boone asserts that MVM contacted him at his home in Colorado, not only in February 2004, but also in August 2004 after he had resigned and had been read off

the program.  In these discussions, an oral agreement was made regarding employment with MVM, pay and all substantive provisions, including the provision that such employment would continue unless there was good or just cause for termination.  . No mention was ever made to Boone that he would be asked to sign the ICA in the "whirlwind" of events in Virginia in March 2004 on his way to Baghdad.  Boone accepted the February offer, but MVM did not yet have the Contract, so it did not have a position for him.

Boone then deployed with CIS (Heritage) to Toshkent, Uzbekistan.  While Boone was there, MVM was awarded the Contract from a classified agency of the U.S. Government, and the job offer that was on the table for Boone was now open.  Boone decided not to stay with CIS, contacted MVM, and, bingo, he was on a flight to Virginia, where he stayed for three days and then was deployed with MVM on the first Scorpion Team to Baghdad.

While Boone was in Virginia headed for Baghdad, MVM had him sign the ICA. To Boone, it looked just like the CIS Employment Agreement and that is what he thought he was signing.  The two agreements are very different.  The ICA purports to create an independent contractor relationship whereas the CIS Employment Agreement created an intermittent employment relationship that could only be terminated for just cause.  Thus, there was no meeting of the minds on the central tenant of the agreement, and the ICA did not comport with Boone's prior understanding of the terms and conditions of employment.

Furthermore, the facts of Boone's employment defeat the purported purpose of the ICA which was to create an independent contractor relationship. Boone was subject to MVM and Client control in all aspects of his deployment; he was paid on a per diem rate of $860 per day regardless of what work he did; he had to be on call 24/7 for his entire deployment; and MVM and the Client provided all of his tools, weapons, food, shelter, transportation, etc. In short, MVM cannot overcome the IRS Twenty-factor test. Because the ICA failed to accomplish its primary purpose, it should be deemed void.

In any event, even if the ICA is valid for the March – June 2004 period, which Boone does not concede, it terminated in June 2004 with Boone's resignation and read off the program.

Boone has therefore pled all of the elements required under C.J.I 31:1 and 31:3 and his First Claim for Relief should go to the jury.

### Second Claim for Relief

### Breach of Standards of Conduct and CENTCOM Rules

Boone's Second Claim for Relief states a claim for breach of MVM's Standards of Conduct and CENTCOM Rules. Amend. Compl. ¶¶ 197 – 217. This is an alternative claim for breach of an implied contract created by MVM's Standards of Conduct and the CENTCOM Rules of Engagement that MVM incorporated into its employment relationship with Boone. Thus, the same elements apply here as set forth above.

While Boone was in MVM's office in Virginia on his way to Baghdad, MVM provided Boone with its Employee Manual or Handbook that contained the Standards of Conduct.  MVM specified that its Standards of Conduct were "*vital*" and that they *must be observed by the Employee*."  **Ex. 9**, p. 3 (emphasis added).  MVM states further that the Standards of Conduct list, "examples of *conduct that will not be tolerated by MVM*.  Amend. Compl. Ex. D, ¶ 3 (emphasis added).  This is not discretionary language – this is mandatory language.  By its own strong words, MVM expected its employees to abide by *all* of its Standards of Conduct.  MVM should also be so bound.

MVM's Standards of Conduct are consistent with MVM's original agreement with Boone that he would only be discharged for good or just cause.  They are also consistent with the CIS Employment Agreement that Boone thought mirrored the ICA that he signed.  These *vital* Standards of Conduct set forth actions that would "not be tolerated by MVM" and thus would constitute "just cause" for termination.  Tully testified that these Standards applied to everyone who worked for MVM.

As of February 20, 2007, at 5:00 PM, plaintiff received MVM's Contract (**Ex. 5**)in response to discovery.  We now know what rules Boone was bound by.  While his Amd. Cpl. alleges the CENTCOM Rules (which applied in any event), the Contract sets forth specific rules, including Rules of Engagement, that controlled the Scorpion Team.

MVM's *vital* Standards of Conduct required that Boone perform his services in compliance with all applicable state and federal laws and in conformance with the highest recognized and accepted professional standards and ethics.  Amend. Compl.,

¶ 199.  These standards would include the requirements specified in the Contract, which itself required MVM to issue Standards of Conduct.

MVM issued its Standards of Conduct and is therefore bound by them, just as it expected its employees and personnel to be bound by them.  MVM's Standards of Conduct required Boone to report "serious violations of the Standards of Conduct by any MVM employee."  (Here, again, MVM refers to "employees," not independent contractors.)  Boone observed several serious violations of MVM's Standards of Conduct including a fraudulent AAR, a romantic affair between a Team member and a member of the Client's staff, and the acquisition and storage of unauthorized weapons by certain Scorpion Team members.  Boone brought these to the attention of Pietragallo, his team leader.

MVM stated that "conduct that will not be tolerated by MVM" included "[f]ailure to notify management of serious violations of the Standards of Conduct by any MVM employee."  **Ex. 9**, p. 3, ¶ 29.  By issuing its Standards of Conduct and requiring Boone to report any serious violations thereof, MVM made an implicit tit-for-tat promise that it would protect any employee that made any such report and would not retaliate against that employee.  Boone reported the "serious violations" he observed.  MVM breached its own promise by firing him for so doing.  Boone has met all of the elements required under C.J. I 33:1 and 33:3.  Therefore, Boone's Second Claim for Relief should not be dismissed.

### Third Claim for Relief

### Wrongful Discharge in Violation of Public Policy

Boone's Third Claim for Relief states a claim for wrongful discharge of public policy.  Amend. Compl. p. 22, ¶¶ 218 – 235.

As discussed in preceding sections, Colorado law controls this case because Colorado is the state with the most significant relationship to the claims.  However, even if Colorado law does not control this claim, the analysis under Virginia law would be the same.  Order on Motion for Judgment on Pleadings (Doc. 60) dated February 15, 2007.

Additionally, as set forth above, Boone was an at-will employee who could only be discharged for cause.  This if true if the ICA is found to be invalid for any of the reasons set forth above, but also true because Boone resigned in June 2004, was read off the program, and as a result the ICA was terminated.  When MVM invited Boone back to re-employment in August 2004, no new ICA was signed nor was any amendment made to reinstate it.

To establish a *prima facie* case for the tort of discharge in violation of public policy under Colorado law, C.J.I. 31:11, Boone must prove that (i) MVM directed Boone to do, or not do, some act; (ii) that Boone refused to comply with MVM's directive; (iii) that MVM should have known that Boone's refusal to comply was based on his reasonable belief that to do so would have been a violation of Boone's rights as an employee; and that (iv) as a result of Boone's refusal to comply, MVM fired Boone.  Under C.J. I. 31:13, if Boone had complied with MVM's directive to do or not do some

act, Boone's conduct would have been either illegal, contrary to Boone's duty as a citizen, or a violation of Boone's legal right or privilege as an employee of MVM.

The gravamen of Boone's claim of discharge in violation of public policy is that he observed conduct on behalf of MVM employees that was illegal, a violation of MVM's Standards of Conduct, or a violation of the Rules of Engagement specified in the Contract. Such conduct included (i) an illicit love affair by an MVM employee with a uniformed member of MVM's Client's staff on Embassy grounds thus violating the Uniform Code of Military Justice and exposing the uniformed member to the risk of serious criminal consequences; (ii) the acquisition and possession of illegal and dangerous weapons by MVM employees on Embassy grounds including AK-47s and hand grenades that were not authorized by the Contract; and, (iii) the submission to an agency of the U.S. Government of a false AAR concerning the Nov. 20, 2004 airport road action. Of the three, the false AAR is the most serious. As Tully testified, this was a "major incident." Tully Depo. 33:10–11.

Boone reasonably believed that each of these actions were illegal. They were certainly violations of MVM's own Standards of Conduct and of the Contract with MVM's Client. Submitting a false report to the government, such as the false AAR, is a violation of **18 U.S.C. § 1001(a)**. It is also a violation of MVM's Contract with its Client. **Notice, Ex. C**, ¶ 6.2 b) (MVM0616) ("Falsification of unlawful concealment, removal, mutilation, or destruction of official documents or records or concealment of material facts by willful omission from official documents or records.").

Under MVM's own mandatory Standards of Conduct, Boone had an absolute duty to report all of these violations to MVM, First to his team leader, Pietragallo, and then to MVM management in Virginia.  As described above, Smith and Romanzo, the primary culprits in these shenanigans were successful in convincing Pietragallo and Sengebush that Boone did "not fit in."  Of course, he did not fit in – he was calling their cards.  For this, Boone was fired.

The court in ***Flores v. American Pharmaceutical Services, Inc***., 994 P.2d 455 (Colo. App.1999), stated that:

> The public-policy exception to the at-will employment doctrine is grounded on the principle that an employer should be prohibited from discharging an employee for reasons that contravene substantial and widely accepted public policies. Although public-policy wrongful discharge is not subject to precise definition, it has been variously described as an action relating to a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer, or strikes at the heart of a citizen's social rights, duties, and responsibilities.

***Flores*** at 458.

The Colorado Supreme Court has observed that:

> A professional employee forced to choose between violating his or her ethical obligations or being terminated is placed in an intolerable position . . . It is just such a situation that the public policy exception was meant to prevent. As we stated in Lorenz, 'an employee should not be put to the choice of either obeying an employer's order to violate the law or losing his or her job.'"

***Rocky Mountain Hosp. and Medical Service v. Mariani***, 916 P.2d 519, 525 (Colo. 1996) (citation deleted).  The ***Mariani*** court held that "professional ethical codes" may contain statements of public policy.  *Id*.

In the instant case, a federal statute, **18 U.S.C. § 1001(a)**, and MVM's Contract with the government {(**Notice, Ex. C**, ¶ 6.2 b) (MVM0616)} make it illegal to submit false reports to the government.  This is a concise statement of public policy applicable to anyone who might be in a position to submit a report to the government.  It is a policy that applies to Colorado, as well as all states, because Colorado taxpayers help fund the federal government and thus have a strong interest in truthful reporting.  This Court also has a strong interest in protecting the federal government from false reporting.

MVM captured this public policy in its *vital* Standards of Conduct that MVM states list "conduct that will not be tolerated by MVM."  **Ex. 9**.  One of the conducts that "will not be tolerated by MVM" is: "Falsification . . . falsifying reports."  Not only is this consistent with the prohibitions stated in **18 U.S.C. § 1001(a)**, but it is consistent with Boone's 20 years of professional military service and the values that the Army expects its special forces soldiers, and in fact all soldiers, to adhere to.  MVM's Contract with the government also prohibits falsification.  **Ex.** 5, §6.2 b) ("[f]alsification . . . of official documents . . . .").

Thus, MVM's Standards of Conduct and the Contract are analogous to the "professional ethical codes" relied upon by the ***Mariani****, supra*, court, as containing statements of public policy.

In essence, Boone claims that MVM's Standards of Conduct created an implied contract that MVM would not retaliate against or punish Boone because he adhered to

MVM's requirement that he "notify management of serious violations of the Standards of Conduct by any MVM employee."

MVM can't have it both ways: It can't require Boone to "notify management of serious violations of the Standards of Conduct by any MVM employee," and then fire him for so doing.  As in **Mariani**, *supra*, Boone can't be "forced to choose between violating his . . . ethical obligations or [be] terminated."

Boone has pled all of the elements of a claim for wrongful discharge in violation of public policy.

## VI. CONCLUSION

For the reasons set forth above, MVM's Motion for Summary Judgment should be denied in its entirety and this case sent to a jury.

DATED: July 13, 2007.

Respectfully submitted,

THOMAS H. STOCKER, P.C.,
Attorney at Law

*s/ Thomas H. Stocker, signature on file*
By: _____
Thomas H. Stocker, #14716
200 Union Blvd., #118
Lakewood, Colorado  80228

Phone:  303-988-4205
Fax: 303-989-2825
Email: tom@thstocker.com
Attorney for Plaintiff, Dave A. Boone

Attachments: Exhibit 1 (Index to Exhibits) plus Exhibit Nos. 2–22 (all filed on June 15, 2007 with the original Response).

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 13, 2007, a true and correct copy of the foregoing was served as follows:

Via ECF to:

District Court Clerk - Civil
Alfred J. Arraj US Courthouse
901 19th Street
Denver, CO 80294

Jason M. Branciforte, Esq.
Katherine A. Goetzl, Esq.
Littler Mendelson
1150 17th Street, NW, #900
Washington, D.C.  20036

Lawrence W. Marquess, Esq.
Michael A. Freimann, Esq.
Littler Mendelson
1200 17th Street, # 1300
Denver, CO 80202-5835

Via email to:

Dave A. Boone

/s/ Thomas H. Stocker, signature on file