IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 05-cv-02504-EWN-CBS

DAVE A. BOONE,

      Plaintiff,

v.

MVM, INC.,

      Defendant

---

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. # 79], filed on May 4, 2007. Plaintiff filed a response on June 15, 2007 [Doc. # 87] and, with leave of Court, filed an amended response on July 13, 2007 [Doc. # 106]. Defendant replied on August 6, 2007 [Doc. # 109]. Having reviewed the submissions of counsel, the record, and applicable law, the Court enters the following order.

## I.      BACKGROUND

This litigation arises from an employment arrangement between Plaintiff Dave A. Boone and Defendant MVM, Inc. ("MVM"), a company whose principal place of business is in Virginia. MVM hired Boone, a retired Army Special Forces soldier, to perform private security services in Iraq. Boone claims he was terminated prior to serving the number of agreed-upon rotations in Iraq for reasons which violated applicable standards and public policy.

The following facts are either undisputed or viewed in the light most favorable to plaintiff, the non-movant. Plaintiff, who was exploring potential employment options, contacted MVM by telephone in early 2004 from his home in Colorado. (Pl.'s Depo., Ex. A-2 to Def.'s S.J. Br., at 90, 92.) MVM informed plaintiff it was recruiting for contracts it had with government agencies and requested that he submit a resume, which he did. (*Id.*) Jack Taylor, MVM's Director of International Operations, then contacted plaintiff and conducted an informal telephone interview, during which they discussed plaintiff's background, the general type of work he would be doing for MVM, and the lucrative nature of the work. (*Id.* at 93–94.) Plaintiff's understanding after the interview was that Taylor would pass on plaintiff's information to an MVM program manager. (*Id.* at 94.) Plaintiff was subsequently contacted two or three times by an MVM employee about completing some administrative paperwork. (*Id.* at 95.) However, MVM had not mentioned a particular position to plaintiff, nor was a position available at that time because MVM had not yet received the contract for which it was considering hiring plaintiff. (*Id.* at 96.)

Because no positions were available with MVM, plaintiff accepted a position with a company called Heritage Services, Inc. d/b/a Coastal International Security ("CIS") and was deployed to Tashkent in March 2004. (*Id.* at 41, 65, 97–98.) However, plaintiff resigned his position with CIS 16 days after arriving in Tashkent because he felt there were leadership problems and security issues. (*Id.* at 65–66.) Plaintiff then contacted MVM from Tashkent and was told a position was available that needed to be filled quickly. (*Id.* at 98–99.) Plaintiff agreed to fly directly to Washington. (*Id.* at 99–100.) He arrived in Washington on the evening of

March 22, 2004 and began preparations for deployment to Iraq at MVM's headquarters in Virginia the next day. (*Id.* at 101.)

Because the deployment was scheduled for March 25th or 26th, preparations had to be completed quickly. (*Id.* at 102.) Plaintiff's activities during the approximately three days preceding his deployment included obtaining equipment, completing administrative forms, undergoing weapons qualification, and taking a polygraph. (*Id.* at 102–05.) He was given an employee handbook that included MVM's standards of conduct. (*Id.* at 131.) Either the night or morning before his deployment plaintiff was asked to review and sign some "final documents," including a contract entitled "Independent Contractor Agreement" ("ICA"). (*Id.* at 117.) Plaintiff "went through" the documents as he was signing them and noted that they were "pretty standard" and that the ICA "was almost verbatim as [the] contract with CIS." (*Id.* at 119.) He testified that things were "rushed" and that he "spent probably three or four minutes" reviewing the ICA, but did not discuss the terms with anyone before signing it. (*Id.* at 120, 129.)

Under the ICA, MVM agreed to engage plaintiff to perform services "in connection with a contract between MVM and the U. S. Government." (Ex. A-5 to Def.'s S.J. Br., ¶ 1.) The ICA states: "It is expressly understood that the requests for Services, if any are made, shall be from time to time and for varying durations." (*Id.*) The ICA had a one-year term from the "Effective Date" of March 23, 2004, although the ICA also provided that "[e]ither party shall have the right to terminate this Agreement on an earlier date, or upon a Material Breach of this Agreement, effective immediately upon the delivery of notice of termination from the non-breaching party to

the breaching party."[1]  (*Id.* ¶ 2.)  Any notice given under the ICA was "sufficient if in writing and if sent by registered or certified mail" to the other party.  (*Id.* ¶ 11.)  Finally, the ICA contains a choice of law provision stating that the agreement "shall be governed by the laws of the Commonwealth of Virginia."  (*Id.* ¶ 12.)

The ICA did not set forth a specific number of rotations abroad that would take place during the term of the agreement.  When asked whether he had any discussions with MVM about the number of rotations he would have under the ICA, plaintiff testified:

> Not per se.  The original year contract was to cover, obviously, 90 [days in] and 30 [days] out.  It was a three rotation period for that year.

> The underlying contract, as long as it remained unchanged in terms of the requirements of the client and in effect, because of the difficulty of vetting personnel with the requisite skills and clearances, the understanding was that we just continue.

(Pl.'s Depo. at 149.)

MVM deployed plaintiff to Baghdad, Iraq on the "Scorpion" program from March 25 or 26, 2004 to June 20, 2004.  (*Id.* at 145.)  While in Iraq, plaintiff and the other team members were told they were required to comply with the CENTCOM (United States Central Command)[2] rules of engagement and were provided with a "quick reference card" summarizing "basic rules of engagement" that were "derived from" the CENTCOM rules, although plaintiff has never seen the actual CENTCOM rules.  (*Id.* at 313, 322.)  During this rotation, plaintiff raised concerns with

---

[1] The inclusion of the word "or" in this sentence appears to be a typographical error, as MVM concedes in its briefing that it could only terminate the ICA before the expiration of its term upon a material breach by plaintiff.  (Def.'s S.J. Br. at 25.)

[2] *See* Am. Compl. ¶ 64; *see also* [www.centcom.mil](www.centcom.mil).

MVM management about the activities of two other Scorpion team members that plaintiff considered unethical, including discussing the formation of a competing company, purchasing weapons, and submitting false receipts. (*Id.* at 163–64.) When plaintiff returned from Iraq, he met with several MVM supervisors in Virginia, including Jack Taylor and the Scorpion team program manager, Lou Sengebush, to discuss his concerns. (*Id.* at 167.) Plaintiff informed them that he was resigning from the Scorpion program in light of the above-described activities, although there is no evidence that plaintiff notified MVM in writing of his resignation. (*Id.* at 167–68.) After the meeting, plaintiff was required to be "read off" by the government client's security officer, meaning he had to sign various non-disclosure statements regarding information he had been "privy to due to [his] association with the client." (*Id.* at 178.) Plaintiff then returned to Denver and began seeking other employment. (*Id.* at 171.)

In August 2004, an MVM representative contacted plaintiff in Colorado, informed him that his personnel concerns had been resolved, and asked him to rejoin the Scorpion program. (*Id.* at 171–72.) Plaintiff agreed, and they discussed that the terms of his employment "would be the same. I'd be coming back just as if I had come off of rotation." (*Id.* at 173.) However, the parties did not sign a new ICA, and plaintiff testified that "I was still operating under the contract, as I understood it, that I was originally on. I just felt that we were starting anew. I should have signed a new one – that's my understanding – but I didn't." (*Id.* at 181.) He also testified his understanding was that he was "operating under the terms of, as expressed in [the ICA], just a new contract" with a new start date. (*Id.* at 182.)

Plaintiff began a rotation in Iraq on August 27 or 28, 2004, and returned to the United States on December 8, 2004. (*Id.* at 210.) The Scorpion team leader during this rotation was Michael Pietragallo, and there were five other team members including plaintiff. (*Id.* at 210–11.) While on rotation, plaintiff notified Pietragallo of his concerns about a team member having an affair with a member of MVM's client's staff and about team members' procuring and possessing unauthorized weapons. (*Id.* at 139–40.)

On November 20, 2004, a convoy in which the Scorpion team was traveling was attacked by a vehicle-borne improvised explosive device. (*Id.* at 241–42.) Following the explosion, plaintiff instructed one team member "to safe his weapon" (meaning to take it off the setting which allowed fully automatic firing) and witnessed Tony Romanzo, another team member, begin firing. (*Id.* at 246.) The U.S. Army arrived on the scene, and Romanzo continued shooting after the army commander ordered a cease fire. (*Id*. at 248.) Plaintiff testified he looked for enemy targets to engage, but did not see any. (*Id.*) Plaintiff then relayed the cease fire command to Romanzo, who stopped shooting. (*Id.*) A few days after the incident, Pietragallo contacted Sengebush and asked that plaintiff be removed from the Scorpion team because he was a "liability" and was "not a team player." (Sengebush Depo., Ex. A-6 to Def.'s S.J. Br., at 86–87.)

Shortly after the attack, an After Action Report ("AAR") was prepared. (Pl.'s Depo. at 241.) Plaintiff testified that he had no input into the content of the AAR, which was prepared primarily by two other team members and approved by Pietragallo. (*Id.* at 278–79.) Plaintiff first reviewed the AAR on December 4 or 5, 2004. (*Id.* at 280.) Plaintiff testified that the document was "a complete and utter fabrication" and that he immediately spoke to Pietragallo about it. (*Id.*

at 281.)  Plaintiff informed Pietragallo he could not concur with the AAR and would not corroborate the events as described in the event of an investigation.  (*Id.*)

Plaintiff returned to the United States on December 8, 2004.  (*Id.* at 210.)  On January 13, 2005, about a week before plaintiff was scheduled to be redeployed, plaintiff called Sengebush from Denver to coordinate his return.  (*Id.* at 378–79.)  Sengebush informed plaintiff he was "on hold" because Pietragallo had recommended plaintiff be removed from the project based on concerns about his actions during the November 20th incident.  (*Id.* at 380.)  Plaintiff responded that he believed Pietragallo was retaliating against him for opposing the above-described weapons possession, the illicit romantic relationship, and the content of the AAR.  (*Id.* at 380–81.)  Sengebush instructed plaintiff to call back the next week to give MVM an opportunity to investigate the situation.  (*Id.* at 381.)  When plaintiff called back on January 18th, Sengebush informed him that he would not be redeploying with the Scorpion team.  (*Id.*)  Plaintiff expressed concern over whether Sengebush had informed "the proper people," and Sengebush said he would "go back up the chain and get back to [plaintiff]."  (*Id.* at 381–82.)

Sengebush called plaintiff back the next day and informed him that MVM wanted him to come to corporate headquarters in Virginia.  (*Id.* at 382.)  Plaintiff met with Sengebush, Taylor, and two others at MVM headquarters on January 25, 2005, where plaintiff "went into detail" about the concerns he had already discussed with Sengebush and provided a hard copy of his statement regarding the events of November 20, 2004.  (*Id.* at 383–84.)  Plaintiff was informed during the meeting that he would not be redeployed with the Scorpion team.  (*Id.* at 406.)

Plaintiff filed the underlying action on November 7, 2005, bringing the following three claims for relief: breach of an express or implied employment contract; breach of an implied contract not to retaliate against plaintiff for complying with defendant's Standards of Conduct and the CENTCOM rules of engagement while deployed to Baghdad; and wrongful discharge in violation of public policy. Defendant moves for summary judgment on all claims.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When applying this standard, a court reviews the pleadings and the documentary evidence in the light most favorable to the nonmoving party. *See Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988). To defeat a properly supported motion for summary judgment, "there must be evidence on which the jury could reasonably find for the" nonmoving party. *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In addition, "'where the non-moving party will bear the burden of proof at trial on a dispositive issue' that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 322).

## III.   ANALYSIS

### A.   Breach of Contract

Plaintiff asserts in his first claim for relief that MVM breached an express or implied contract "by not deploying plaintiff as scheduled in January 2005, and for subsequent rotations thereafter." (Am. Compl. ¶ 191.)  MVM contends it is entitled to summary judgment on this claim because the ICA governed the parties' employment relationship and did not specify or guarantee a specific number of rotations.  Plaintiff contends that the ICA does not govern the employment arrangement between the parties because (1) it is an adhesion contract and is therefore void, and (2) even if it is a valid contract, plaintiff terminated the ICA when he resigned from the Scorpion project in June 2004, and a new ICA was never signed when he returned to the team in August 2004.  The parties also dispute whether Virginia or Colorado law applies.

#### 1.   *Choice of Law and Validity of ICA*

A federal court in a diversity case such as this applies the choice of law principles of the forum state.  *Elliot v. Turner Constr. Co.*, 381 F.3d 995, 1001 (10th Cir. 2004).  In turn, Colorado utilizes the Restatement (Second) of Conflict of Laws to resolve choice of law issues, including the application of contractual choice of law provisions.  *Farmington Cas. Co. v. United Educators Ins. Risk Retention Group, Inc.*, 117 F. Supp. 2d 1022, 1025 (D. Colo. 1999).  Under the Restatement, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."  Restatement (Second) of Conflict of Laws § 187(1).

As noted above, the ICA contains a choice of law provision stating that Virginia law applies to the agreement. (Ex. A-5 to Def.'s S.J. Br., ¶ 12.) However, if the ICA is an adhesion contract, as plaintiff contends, then the choice of law provision should not be applied "if to do so would result in substantial injustice." Restatement (Second) of Conflict of Laws § 187 cmt. b. In determining whether the ICA is an adhesion contract, the court applies the law of the forum state. *See Sall v. G.H. Miller & Co.*, 612 F. Supp. 1499, 1506 (D. Colo. 1985) (applying Colorado law in determining whether agreement containing Illinois choice of law provision was an adhesion contract).

The determination of whether an agreement is an adhesion contract is a question of law for the court. *Jones v. Dressel*, 623 P.2d 370, 374 (Colo. 1981). An adhesion contract is defined as "a contract drafted unilaterally by a party and forced upon an unwilling and often unknowing public for services that cannot readily be obtained elsewhere." *Id.* (citation omitted). However, even a "printed form" contract that is "offered on a 'take-it-or-leave-it' basis" will not constitute an adhesion contract without "a showing that the parties were greatly disparate in bargaining power, that there was no opportunity for negotiation, or that (the) services could not be obtained elsewhere." *Id.* (citations and quotation marks omitted).

Applying these principles, the court holds that the ICA was not an adhesion contract and that the choice of law provision is valid. Although the ICA was drafted by MVM, no other elements of an adhesion contract are present. Plaintiff notes that preparations for deployment to Iraq were rushed and that he had to sign a number of documents during those few days. However, plaintiff had the opportunity to review the ICA before he signed it, and there is no

indication that he expressed any concerns about it to MVM or was discouraged from doing so. Plaintiff's conclusory argument that the ICA was presented "on a take it or leave it basis" is simply not supported by any evidence. Nor is there a showing that the parties had greatly disparate bargaining power. Indeed, MVM had its own contractual obligations to meet and needed plaintiff as much as he needed MVM. Moreover, plaintiff provides no evidence, or even an argument, that applying the ICA's choice of law provision "would result in substantial injustice." Restatement (Second) of Conflict of Laws § 187 cmt. b.

Plaintiff also appears to argue that the ICA is invalid because he "did not understand" it, and there was thus "no meeting of the minds as to the ICA." (Pl.'s Resp. at 16.) Specifically, plaintiff argues that the ICA "looked like" a prior employment contract he had entered into with another security company, that he incorrectly assumed the terms of the ICA would be the same, and that he and MVM therefore had materially different expectations regarding the agreement. (*Id.*) However, "[i]n the absence of fraud, duress, or mutual mistake[,] an individual having the capacity to understand a written document who signs it after reading it, or who signs it without reading it, is bound by the signature." *Kocinec v. Pub. Storage, Inc.*, 489 F. Supp. 2d 555, 561 n.4 (E.D. Va. 2007) (applying Virginia law) (quotation marks and emphasis omitted). At best, plaintiff asserts there was a unilateral mistake on his part as to the terms of the ICA, but a unilateral mistake does not void an otherwise legally binding contract. *Chang v. First Colonial Sav. Bank*, 410 S.E.2d 928, 930 (Va. 1991) (citations omitted).

Finally, plaintiff's argument that the ICA did not govern the parties' relationship because he terminated it in June 2004 is defeated by plaintiff's own testimony. As noted above, plaintiff

testified that, when he agreed to rejoin the Scorpion program In August 2004, he "was still operating under the contract, as I understood it, that I was originally on. I just felt that we were starting anew." (Pl.'s Depo. at 181.) He also testified his understanding was that he was "operating under the terms of, as expressed in [the ICA], just a new contract" with a new start date. (*Id.* at 182.) Thus, with the arguable exception of the term of the agreement, both parties understood the terms of the ICA to govern their agreement in August 2004.

For the foregoing reasons, the Court holds that the ICA constituted a valid, binding agreement between the parties.[3] In addition, the choice of law provision will be enforced, and Virginia law applies to plaintiff's breach of contract claims.

### 2. *Alleged Obligation to Redeploy Plaintiff in December 2004*

The ICA provides that MVM "agrees to engage [plaintiff] to perform armed protection duties, and/or other security-related assignments (the 'Services'), in connection with a contract between MVM and the U. S. Government." (Ex. A-5 to Def.'s S.J. Br., ¶ 1.) As noted above, the ICA also states that "[i]t is expressly understood that the requests for Services, if any are made, shall be from time to time and for varying durations." (*Id.*) These provisions unambiguously demonstrate that MVM had no duty under the ICA to deploy plaintiff for a specific number of overseas rotations or for a specific number of days. Thus, while plaintiff alleges in his amended complaint that "[t]he term of employment provided for a minimum of three in-country rotations," (Am. Compl. ¶ 182), the express terms of the ICA simply do not support

_____

[3] Although the ICA provides that plaintiff is an independent contractor of MVM, the parties dispute whether plaintiff was legally an employee or an independent contractor. This dispute, however, is immaterial to whether the ICA is a valid contract.

that assertion. Rather, MVM had discretion under the ICA to determine if and when plaintiff would be deployed.

Plaintiff appears to argue that the allegedly agreed-upon number of rotations stems not from the ICA, but from "an oral agreement" the parties reached during their phone conversations before his deployment. (Pl.'s Resp. at 55–56.) This argument fails for two reasons. First, there is no evidence that such an agreement existed. Plaintiff alleges in his complaint that the "principal terms and conditions of plaintiff's employment with MVM" were agreed upon during the February 2004 conversation and that MVM "specified that there would be a minimum of three rotations." (Am. Compl. ¶¶ 38, 40.) However, plaintiff testified in his deposition that his February 2004 phone conversation with Jack Taylor of MVM constituted an informal telephone interview, during which they discussed plaintiff's background, the type of work he would be doing for MVM, and the lucrative nature of the work. (Pl.'s Depo. at 93–94.) This admittedly general conversation did not result in an enforceable oral contract, which is formed only "if its terms are sufficiently definite and certain," if "the parties reached agreement with respect to the contract's material terms," and if "the parties' intention to be bound is objectively manifested." *Elite Entm't, Inc. v. Khela Bros. Entm't Inc.*, 396 F. Supp. 2d 680, 692 (E.D. Va. 2005) (applying Virginia law) (citations omitted).

In addition, as noted above, when asked whether there was any discussion prior to plaintiff's deployment about the number of rotations he would have with MVM, plaintiff testified, "Not per se. The original year contract was to cover, obviously, 90 [in] and 30 out. It was a three rotation period for that year." (Pl.'s Depo. at 149.) While this testimony may be evidence

of plaintiff's understanding of some of the terms of the agreement, it is not evidence that this subjective understanding was based on a promise made by MVM or that MVM manifested an intention to be bound by such a term. *See Phillips v. Mazyck*, 643 S.E.2d 172 (Va. 2007) (whether a party assented to the terms of a contract is ascertained "from that party's words or acts, not from his or her unexpressed state of mind").

Even if plaintiff's testimony constituted evidence of an oral agreement, it is barred by the parol evidence rule, which "prohibits using extrinsic evidence of 'prior or contemporaneous negotiations . . . to alter, contradict or explain the terms of a written instrument provided the document is complete, unambiguous and unconditional.'" *Swengler v. ITT Corp. Electro-Optical Prods. Div.*, 993 F.2d 1063, 1069 (4th Cir. 1993) (alteration in original) (quoting *Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner*, 303 S.E.2d 894, 898 (Va. 1983)). Given that the ICA does not provide for a particular number of rotations and vests discretion in MVM whether to deploy plaintiff, the alleged oral agreement to the contrary cannot be used to supplement the ICA.

Finally, although plaintiff appears to assert as an alternative claim in his complaint that the failure to redeploy him constituted breach of an implied-in-fact contract, such a claim does not comport with the proffered evidence and arguments. An implied-in-fact contract must be inferred "from the course of conduct of the parties" when they "have not reduced [the contract] to writing or to an oral agreement." *Nossen v. Hoy*, 750 F. Supp. 740, 744 (E.D. Va. 1990) (applying Virginia law). Here, the contract between plaintiff and MVM has been reduced to writing in the form of the ICA, and at best plaintiff argues, unsuccessfully, that there is an additional oral

agreement between the parties regarding the terms of his employment. Thus, this is an inappropriate case in which to recognize an implied-in-fact contract.

Accordingly, plaintiff's first claim for relief for breach of express or implied contract fails as a matter of law, and MVM is entitled to summary judgment on this claim.

### B.  Breach of MVM's Standards of Conduct and CENTCOM Rules

Plaintiff next claims that, in failing to deploy plaintiff for additional rotations, MVM breached an implied contract not to retaliate against plaintiff for complying with MVM's standards of conduct and the CENTCOM rules of engagement. (Am. Compl. ¶ 212.) Plaintiff's argument may be summarized as follows: (1) MVM gave plaintiff a copy of its standards of conduct, with which plaintiff was required to comply; (2) plaintiff was required under those standards to notify MVM management of serious violations thereof; (3) MVM accordingly was implicitly required not to retaliate against plaintiff for reporting such violations; (4) plaintiff reported several violations, including the false AAR, the romantic affair between a team member and a staff member of MVM's client, and unauthorized possession of weapons by team members; and (5) MVM breached its implied promise by failing to redeploy plaintiff to Iraq in January 2005 and thereafter in retaliation for his actions. (*Id.* ¶¶ 198, 201, 209–12; Pl.'s Resp. at 58–59.)

As noted above, MVM appears to concede that it could only terminate the ICA before the expiration of its term upon a material breach by plaintiff. (Def.'s S.J. Br. at 25.) Again, however, the ICA vests discretion with MVM to determine when and how often to utilize plaintiff's services during the term of the ICA, and MVM therefore had no contractual duty to deploy plaintiff, regardless of the reason. Moreover, plaintiff has provided no legal authority, and the

court is unaware of any, to support the proposition that MVM had an implied *contractual* duty not to retaliate against plaintiff. Thus, plaintiff's second claim for relief fails as a matter of law, and the court turns to plaintiff's claim that he was discharged in violation of public policy.

### C.    Wrongful Discharge in Violation of Public Policy

In his third claim for relief, plaintiff claims he was terminated in violation of public policy for objecting to other team members' failure to comply with MVM's standards of conduct and 18 U.S.C. § 1001, which prohibits making false statements in a government document.

### 1.    *Choice of Law*

Because plaintiff's public policy claim sounds in tort rather than contract, the court must engage in a separate choice of law analysis for this claim. As with contract claims, Colorado has adopted the Restatement (Second) of Conflict of Laws to resolve choice of law issues in tort actions, and the Restatement in turn requires application of the law of the location with the most significant relationship to the occurrence and the parties. *Morgan v. United Air Lines*, 750 F. Supp. 1046, 1054 (D. Colo. 1990). The contacts relevant to this determination include: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship between the parties, if any, is centered. Restatement (Second) of Conflict of Laws § 145(2). The court must evaluate these contacts "according to their relative importance with respect to the particular issue" in dispute *Id.*; *Scheer v. Scheer*, 881 P.2d 479, 480 (Colo. App. 1994).

It is clear that the second relevant contact—the place where the conduct causing the injury occurred—is Virginia, the state where MVM is headquartered and where the decision was made not to redeploy him on the Scorpion project.  (*See* Sengebush Depo. at 188.)  The first contact, the place where the injury occurred, could arguably be either Virginia or Colorado.  Plaintiff was in Colorado when he was first informed by Sengebush over the phone in January 2005 that he would not be redeploying with the Scorpion team.  (Pl.'s Depo. at 381–82.)  However, Sengebush subsequently told plaintiff to "stand by" until Sengebush could "go back up the chain." (*Id.* at 382.)  Plaintiff then flew to Virginia and met with several MVM representatives at MVM headquarters, where he detailed his concerns about the events that had transpired in Iraq.  (*Id.*) At the meeting, "the decision . . . was made" and plaintiff was told that he would not be redeployed on the project.  (*Id.* at 406.)  Thus, it appears that the communication to plaintiff of the final decision not to redeploy him occurred while all parties were in Virginia.

The third contact involves the residence and place of business of the parties.  MVM was incorporated in California, and its principal place of business is in Virginia.  (Am. Compl. ¶¶ 27, 29.)  Plaintiff's residence, however, is not so clear, and the parties dispute whether plaintiff was a Colorado resident when the events giving rise to this lawsuit occurred.  Plaintiff's 2004 income tax return, filed on May 11, 2005, lists his address as a PO Box in Alaska.  (Ex. A-1 to Def.'s S.J. Br.)  In addition, plaintiff listed an Alaska address in some paperwork, including a Form W-4, that he filled out in connection with his employment with another company in October 2005. (Pl.'s Depo. at 73; Exs. A-7 & A-9 to Def.'s S.J. Br.)  In a section of one of the forms that asked for plaintiff's seven-year residence history, plaintiff listed one Alaska address.  (Ex. A-9.)  Plaintiff

also maintained an Alaska driver's license and paid Alaska unemployment taxes in 2005. (*Id.*; Ex. A-10 to Def.'s S.J. Br.) However, plaintiff maintained a residence in Colorado with his wife, who was a full-time higher education student in Colorado through 2005. (Pl.'s Aff. ¶¶ 7–8, Ex. 4 to Pl.'s Resp.) In addition, plaintiff's paychecks from MVM were delivered to his Colorado residence, and beginning in 2001 plaintiff returned to that residence after each overseas deployment. (Ex. A-8 to Def.'s S.J. Br.; Pl.'s Aff. ¶¶ 7, 9.) Thus, there is evidence that plaintiff physically lived in Colorado in 2004 and at least part of 2005; however, it appears that his permanent residence remained in Alaska, and plaintiff has provided no evidence that he continued to live at his Colorado residence after 2005.

The fourth contact is the state where the relationship between the parties is centered. The parties in this case first discussed plaintiff's potential employment with MVM during phone conversations between MVM in Virginia and plaintiff in Colorado. When MVM informed plaintiff that it had an available position, plaintiff was overseas in Tashkent. Plaintiff filled out all the necessary paperwork and conducted all preparations for deployment in Virginia. Plaintiff also reviewed and signed the ICA in Virginia. Plaintiff resigned from the Scorpion team in June 2004 while he was at MVM's headquarters in Virginia, and he was asked to rejoin the team in August 2004 during a phone conversation between MVM in Virginia and plaintiff in Colorado. As discussed above, plaintiff was in Colorado when Sengebush first informed him in January 2005 that he would not be redeploying with the Scorpion team, but the final decision not to redeploy him was made in Virginia and communicated to him while he was at MVM headquarters in

Virginia. This evidence demonstrates that the relationship between the parties for purposes of plaintiff's wrongful discharge claim is centered in Virginia.

The above-described contacts compel the application of Virginia law to plaintiff's wrongful discharge claim. The second and fourth contacts clearly weigh in favor of applying Virginia law, while the first and third contacts implicate connections to both Virginia and Colorado. Colorado's principal interest in the case stems from plaintiff's maintenance of a residence there when the actions underlying the claims arose. However, this interest is attenuated by the fact that plaintiff appears to have maintained a permanent residence in Alaska and the lack of evidence as to whether plaintiff continues to live in Colorado. Thus, the court will determine under Virginia law whether MVM is entitled to summary judgment on plaintiff's wrongful discharge claim.

### 2. *Substantive Analysis*

Virginia recognizes a narrow exception to the employment-at-will doctrine when employees are discharged in violation of public policy. *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985). Policies sufficient to warrant a wrongful discharge claim may be found in "laws containing explicit statements of public policy" and in laws that are "designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general." *City of Va. Beach v. Harris*, 523 S.E.2d 239, 245 (Va. 2000) (quotation marks and citation omitted). Significantly, Virginia courts have refused to recognize a wrongful discharge claim when it is based on the violation of policies that are not embodied in Virginia statutes. *E.g.*, *Anderson v. ITT Indus. Corp.*, 92 F. Supp. 2d 516, 518–19 (E.D. Va. 2000) (noting prior

dismissal of plaintiff's wrongful discharge claim, as plaintiff had alleged only that his discharge violated federal False Claims Act and had "failed to identify a *Virginia* public policy that was allegedly violated) (emphasis in original); *Miller v. SEVAMP, Inc.*, 362 S.E.2d 915 (Va. 1987) (dismissing wrongful discharge claim because termination of employee in retaliation for exercise of rights provided in employee handbook "would have no impact upon any public policy established by existing laws for the protection of the public generally").

In light of the narrow contours of the wrongful discharge claim under Virginia law, plaintiff's claim must be dismissed. Plaintiff cites one federal statute, 18 U.S.C. § 1001, and MVM's standards of conduct as embodying public policies that were violated when he was not redeployed. However, plaintiff has failed to identify any Virginia statutes on which to base his claim, and this failure forecloses the claim from succeeding as a matter of law.[4] Accordingly, MVM is entitled to summary judgment on plaintiff's third claim for relief.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. # 79] is GRANTED, and plaintiff's claims are DISMISSED WITH PREJUDICE. In light of this order, the hearing on defendant's motion for summary judgment set for February 22, 2008 is VACATED. Defendant may have its costs by filing a bill of costs within eleven days of the date of this order.

---

[4] MVM also argues it is entitled to summary judgment because plaintiff was not an at-will employee and because there is no evidence of a causal connection between plaintiff's complaints and MVM's failure to redeploy him. Because MVM is entitled to summary judgment on other grounds, the court need not reach these arguments.

DATED:  February15, 2008

BY THE COURT:


s/ Edward W. Nottingham
Edward W. Nottingham
Chief United States District Judge