Page 1

 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLORADO

 3    Case No. 05-cv-02504-PSF-CBS

 4    _____

 5    DAVE A. BOONE,

 6          Plaintiff,

 7    vs.

 8    MVM, INC.,

 9          Defendant.

10    _____

11          Proceedings before CRAIG B. SHAFFER, United States

12    Magistrate Judge, United States District Court for the

13    District of Colorado, commencing at 9:06 a.m., June 28, 2006,

14    in the United States Courthouse, Denver, Colorado.

15    _____

16          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18    _____

19                      APPEARANCES

20          THOMAS H. STOCKER, Attorney at Law, appearing for

21    the plaintiff.

22          MICHAEL A. FREIMANN and LAWRENCE W. MARQUESS,

23    Attorneys at Law, appearing for the defendant.

24    _____

25                DISCOVERY AND STATUS CONFERENCE

<pre>
 1                   P R O C E E D I N G S
 2              (Whereupon, the within electronically recorded
 3    proceedings are herein transcribed, pursuant to order of
 4    counsel.)
 5              THE CLERK:  All rise.  Court is in session.
 6              THE COURT:  Have a seat, everyone.  All right.
 7    We're on the record in Boone versus MVM, Inc.  This is
 8    05-cv-2504.  Apparently you gentlemen have some discovery
 9    issues.  I'll take appearances of counsel.
10              MR. STOCKER:  Your Honor, Tom Stocker,
11    representing the plaintiff, Dave Boone.
12              MR. FREIMANN:  Michael Freimann and Larry
13    Marquess, Your Honor, for MVM.
14              THE COURT:  Okay.  I received yesterday something
15    styled as Joint Submittal of Parties' Position on Plaintiff's
16    Discovery Request.  This thing apparently purports to
17    identify some discovery requests which apparently are just
18    going to remain the subject of dispute.  And these are the
19    requests you want to bring to my attention; is that correct?
20              MR. STOCKER:  That is correct, Your Honor.
21              THE COURT:  Okay.  Well, I have reviewed them.
22    And I guess the only way we can do this is just to go through
23    them.  I am aware of -- in fact, in order to get ready for
24    this, I went back and read the complaint.  So I'm generally
25    familiar with the claims.  I'm intimately familiar with the
</pre>

1    scope of permissible discovery under Rule 26(b)(1).

2            And having said all of that, I guess what we need

3    to do is to just go through these.  And as I understand it,

4    the first dispute concerns request for production Number 8.

5    That is a request that says admit that at the time of his

6    retention by MVM, and continuing through his separation from

7    MVM, Oscar Hinojosa did not meet the physical fitness

8    requirements for service on the Scorpion PSD team.  Defendant

9    objects to this request for admission as not relevant, as not

10   reasonably calculated to lead to the discovery of admissible

11   evidence.  MVM also objects on the grounds that the medical

12   condition of Mr. Hinojosa is confidential and private

13   information.

14           Well, the first thing that I would observe is a

15   party has a right to discover any relevant, non-privileged

16   information.  The case law clearly recognizes the difference

17   between privilege and confidential.  Now, if you believe that

18   this gentleman's medical information or physical fitness

19   information is private information, then the appropriate way

20   to deal with that would be to get a protective order.  That's

21   assuming, of course, that it's relevant.  And that's the

22   question that I have.  How is this information relevant?

23           MR. STOCKER:  Your Honor, if I could address your

24   first question, we do have a protective order in place in

25   this case.

Page 4

```
 1          THE COURT:  Explain to me how this information
 2   about this gentleman's physical condition is relevant to a
 3   breach of contract case.
 4          MR. STOCKER:  Your Honor, do I need to stand or is
 5   it okay to sit here?
 6          THE COURT:  No.  You can sit.
 7          MR. STOCKER:  Your Honor, Mr. Hinojosa was one of
 8   the six-member team.  And Mr. Boone was essentially fired or
 9   not re -- not redeployed because he apparently did not fit
10   in.  That's what they're saying.  And four others, though,
11   were redeployed.  Five others, actually.  We believe that
12   Mr. Hinojosa did not take any physical exam before he --
13          THE COURT:  Whether you're right or not, you --
14   you still haven't explained to me -- I mean, I know the
15   elements of a breach of contract claim.  Explain to me how
16   this gentleman -- this nonparty's physical condition is
17   relevant to whether or not the defendant breached his
18   contractual obligations to your client.
19          MR. STOCKER:  Okay.  If Mr. Hinojosa wasn't
20   deployed repeatedly and did not pass the physical
21   requirements, then I've got a concern --
22          THE COURT:  Well, but -- but, see, that --
23          MR. STOCKER:  -- about whether he fits in or not.
24          THE COURT:  -- see, that issue might be relevant
25   if, for instance, they terminated your client because they
```

1   said, Look, you don't meet the physical requirements and

2   that's an absolute prerequisite for employment.  You must

3   meat the physical requirements or we can not hire you or we

4   must dismiss you.  Then you might argue, look, there are some

5   other folks that you did keep on, other folks you did hire

6   who also didn't meet the physical requirements, thereby

7   suggesting that the physical requirements are not an

8   essential prerequisite for employment.

9           MR. STOCKER:  Well, in fact, they did have

10  physical requirements.  My client did meet them.

11          THE COURT:  But -- but they didn't terminate your

12  client because of his physical condition.

13          MR. STOCKER:  Well, we're not actually sure why

14  they terminated him.

15          THE COURT:  Well, then -- then --

16          MR. STOCKER:  All they said is that he did not fit

17  in.

18          THE COURT:  -- let's put it this way.  Right now I

19  don't see the relevance of this information, whether

20  Mr. Hinojosa was, you know, one of those folks that had one

21  percent body fat or he's just an excessively obese person,

22  whether he's got a heart condition, or whether he could run a

23  marathon every day of the week.  I don't see how that is

24  relevant to the specific claims asserted in this lawsuit.

25          MR. STOCKER:  If Mr. Hinojosa was deployed, he's

Page 6

1   not able to do his job because he's not physically fit, which

2   he wasn't, and my client is not deployed --

3          THE COURT:  But --

4          MR. STOCKER:  -- Mr. Hinojosa is taking the space

5   that perhaps my client should have had.

6          THE COURT:  Counsel, I'm just not seeing it.  I'm

7   just not seeing it.  I think this request for admission

8   sweeps too broadly.

9          MR. STOCKER:  Well, I mean, I think it's part of a

10  pattern.

11         THE COURT:  Well --

12         MR. STOCKER:  They -- they put four or five

13  guys --

14         THE COURT:  -- you haven't -- let's put it this

15  way.  You haven't presented enough information to me to

16  suggest there's a pattern.

17         MR. STOCKER:  We're trying to find out what's

18  going on with these other guys.

19         THE COURT:  Well, but -- but a request for

20  admission is a lousy way to find out, counsel.

21         MR. STOCKER:  Well, it's --

22         THE COURT:  It's just a lousy way to find out.

23         MR. STOCKER:  -- it's one tool in my toolbox.

24         THE COURT:  It's not a very good tool as you've

25  used it here.  I would not -- if -- if you filed a motion to

1  compel based on what I've heard so far, I would not be

2  inclined to grant that.  That's not to say you can't file a

3  motion to compel, but right now based on what I've heard, I

4  don't really see honestly the basis for a motion to compel on

5  response to request for admission Number 8.

6  MR. STOCKER:  Subsequently, Mr. Hinojosa was

7  discharged from this team a couple months later as far as we

8  can tell.  So we're wondering why he wasn't discharged in

9  January.

10  THE COURT:  Well, then -- then, counsel, counsel,

11  the -- you don't -- counsel, you don't use a request for

12  admission to wonder why.  You might use a deposition.  You

13  might use an interrogatory.  But right now I am not persuaded

14  that this is a proper request for admission given the

15  specific claims asserted in this case.  You have not

16  demonstrated to me how Mr. Hinojosa's physical condition is

17  relevant to your client's allegation that his contractual

18  rights -- his rights were violated.

19  Now, Number 9, request for admission Number 9.

20  Admit that MVM intended that a violation of its standards of

21  conduct could be the basis for termination of any MVM

22  employment -- employee.  I'm sorry.  And the defendant's

23  response is MVM objects to this request for admission on the

24  grounds that it is not relevant.  It is not reasonably

25  calculated.  Without waiving that objection, MVM admits that

Page 8

1   the standards of conduct documents speak for itself.  But

2   that's not responsive.

3            MR. FREIMANN:  Your Honor, we have discussed this

4   again yesterday and we will supplement this response with a

5   better answer.

6            THE COURT:  Okay.  So I don't need to fight about

7   that one.

8            Number 17.  Admit that the independent contractor

9   agreement was not modified for any MVM contractor or employee

10  employed in Iraq.  MVM objects on the grounds that this

11  request for admission is not relevant.  It is not reasonably

12  calculated to lead to the discovery of admissible evidence

13  and preparing a response would be unduly burdensome.  You

14  want to explain to me that objection?

15           MR. FREIMANN:  Yes, sir.  Plaintiff's claim has

16  not -- plaintiff has not raised a discrimination claim or a

17  class action claim.  It's limited to his negotiation or him

18  -- entered into a contract with MVM.  And the plaintiff has

19  not contended that he wanted to modify the contract.  He's

20  not contended that he had knowledge of anyone else who

21  modified their contract.  And, furthermore, MVM is free to do

22  business with other independent contractors as they seem

23  appropriate.  So what this request for admission asks for is

24  not relevant in MVM's opinion to any of the breach of

25  contract claims that the plaintiff has raised.

```
 1              THE COURT:  Well, let me ask this question because
 2    I -- I don't know the answer to this question.  I went
 3    through this and I was sort of struggling somewhat.  Number
 4    16 says, Admit that the independent contractor agreement was
 5    presented to Boone on a take it or leave it basis.  Now,
 6    there the phrase, "independent contractor agreement,"
 7    obviously refers to the specific agreement that Mr. Boone
 8    signed.
 9              MR. FREIMANN:  Correct.
10              THE COURT:  I mean -- and then it's obvious.  He
11    says, The independent contractor agreement."  And independent
12    contractor agreement are all capitalized.  Now, if I read 16,
13    I would reach the conclusion that that phrase, "independent
14    contractor agreement," is shorthand for a very specific
15    agreement.  Now, I look at 17 and, again, it says, The
16    independent contractor agreement, but now that phrase seems
17    to be expansive.  How did -- when you drafted these was
18    independent contractor agreement a defined phrase?  And was
19    it defined to mean simply the agreement that Mr. Boone
20    signed?  If -- if it means that specific agreement,
21    independent agreement that Boone signed, then the answer to
22    this question was it either was or it wasn't modified for
23    Mr. Boone.  But if the phrase is designed to mean sort of
24    this generic agreement -- I'm trying to understand how the
25    phrase was -- was intended.
```

1       MR. STOCKER:  I understand your -- why you're

2   struggling.  The -- the -- certainly the intent of the

3   interrog -- or the admission, Your Honor, was to find out

4   whether the generic independent contractor agreement, I guess

5   lower case letters, was modified for any other alleged

6   contractor.

7       THE COURT:  Then how -- but -- but still then how

8   is that relevant?  Because your allegation in the complaint

9   is, is that there was a very specific agreement, an agreement

10  between MVM and Boone, and that MVM breached its obligations

11  under that very specific agreement.  How would it be

12  relevant?  I mean, if MVM said, Look, we're not going to

13  change the terms of Boone's agreement; that's the agreement

14  we entered into with Boone; that's the agreement we're

15  prepared to live by; what's the relevance if they went ahead

16  and changed everybody else's agreement?

17      MR. STOCKER:  Here's the relevance, Your Honor.

18  We -- we have claims in the alternative.  And one of our

19  claims was that he was not an independent contractor, and

20  that the independent contractor agreement really was a

21  nullity because it was not recognized as an agreement by

22  either party, and it wasn't adhered to.

23      THE COURT:  Okay.  And what specific claim is

24  that?  I mean, point me to the allegations that you say this

25  is a nullity.  You've got a claim for a breach of express or

 1    implied contract.

 2              MR. STOCKER:  Correct.

 3              THE COURT:  And I'm assuming the contract you're

 4    talking about is the independent contractor agreement that

 5    Mr. Boone signed.

 6              MR. STOCKER:  Well --

 7              THE COURT:  That's the express agreement; is that

 8    right?

 9              MR. STOCKER:  Yeah.  We -- well, no -- yes and no,

10    because there was an oral agreement --

11              THE COURT:  That's pleading in the alternative.

12              MR. STOCKER: -- as well, and there was -- there

13    was -- I'm sorry?

14              THE COURT:  That's sort of pleading in the

15    alternative, yes and no.

16              MR. STOCKER:  Yeah, yes and no.  Well, defendants

17    are pretty good at doing that, too.  There's a whole series

18    of allegations in the complaint about Boone not being an

19    independent contractor because none of the parameters

20    required to be an independent contractor existed.  And the

21    independent contractor agreement was something that was --

22    if -- if anything, he's in contracts.  So I guess the idea,

23    Your Honor, is that I'd like to know how it came to be with

24    respect to other so-called independent contractors, whether

25    it was something negotiated between -- you know, on an

1    individual basis between the company and so-called

2    independent contractors.

3            THE COURT:  Well, let me ask this question.

4            MR. STOCKER:  Whether it was given to him on a

5    take it or leave it basis, whether it was modified, those are

6    the kind of things I'm trying to find out.

7            THE COURT:  But -- but I can understand you might

8    want to find out if it was modified as to him.  But to the

9    extent that you're contending that there were certain

10   contractual obligations that existed between your client and

11   MVM, that's -- that's the -- that's the issue.  Did they

12   breach their obligations to your client?  How is it relevant

13   that they may have modified their conditions from somebody

14   else?

15           MR. STOCKER:  Well, if -- if they -- if MVM

16   treated this so-called independent contractor agreement as

17   just a piece of paper, everybody had to sign it, and then

18   they went off and treated all these people as if they were

19   employees complete with a handbook and other things that the

20   employees -- so-called regular employees got, then that I

21   think buttresses my argument that Boone was not an

22   independent contractor and that he was not bound by that

23   agreement because MVM didn't think they were bound by it.

24   They didn't adhere to it.  They didn't adhere to it to him.

25   They didn't adhere to it to other so-called independent

 1   contractors.  And that -- and that gets back to the implied

 2   contract, this contract that was entered into between Boone

 3   and MVM orally on the phone before Boone ever agreed to go to

 4   Iraq, before he ever went to Virginia and signed this thing,

 5   along with umpteen other papers in a hurry in a conference

 6   room without any explanation or -- or discussion at all.  If

 7   that scenario happened to the other six, or I think there

 8   were more than six others altogether on other teams, but at

 9   least the other five, rather, on this team, then that

10   buttresses my argument that they really weren't independent

11   contractors.  They were employees.  MVM treated them as

12   employees, and then the employee handbook and those kind of

13   things should apply.

14             THE COURT:  Well, but, see -- but, see, the

15   problem though is, is that, first of all, I think this

16   request for admission sweeps too broadly.  It's not limited

17   by time.  It's not limited by -- by -- by team.  It just

18   says, Admit that the independent contractor agreement was not

19   modified for any MVM contractor or employee.  I just -- the

20   problem is that, frankly, counsel, it's a very poorly drafted

21   request for admission.  Now, that doesn't necessarily mean

22   that a properly drafted request for admission -- but, again,

23   to be perfectly honest with you, I don't know why you want

24   this info -- well, I don't know why you're using requests for

25   admission to obtain this information.  It seems like a very

1    poor discovery tool, and -- and -- and more importantly, I

2    don't know why you need to serve it now.  I'm at a loss --

3    and this is not -- not unique to this case.  But -- but let

4    me make a couple of observations.

5              First of all, I don't know why a lawyer, and I see

6    this quite frequently, why lawyers serve requests for

7    admission at the same time they serve interrogatories,

8    because it's -- to me the purpose of an admission is to take

9    issues out of the case.  Well, it seems to me the appropriate

10   time to serve requests for admissions is, is before motions

11   for summary judgment are filed.  But setting aside all of

12   that, let me tell you another problem that I've got here.

13   And I don't know exactly how to wrestle with this one.  I

14   gave each side 25 interrogatories.  That's the numerical

15   limit.

16             MR. STOCKER:  That's correct.

17             THE COURT:  Right.  And you have served in this

18   case by my calculation so far, you have served 24

19   interrogatories.  The problem is there's case law out there

20   that says that your first Interrogatory Number 1 is

21   potentially problematic, because you say for each request for

22   admission above that is not answered with an unqualified

23   admission, describe all facts, identify each individual who

24   has relevant knowledge, and identify all documents that

25   support the response given.  There is case law, and I'm happy

1  to give you those citations, which say that to the extent

2  that you are asking them to explain why they didn't admit,

3  for every interrog, for every request for admission that they

4  did not admit that translates into an additional

5  interrogatory.  So, strictly speaking, you may be over the 25

6  limit without leave of Court.

7           And -- and just so you know, the cases that --

8  that adopt that view -- and I think it's a well-reasoned

9  view, you could take a look at.  For instance, Safeco of

10  America v. Rawstron.  That's at 181 Federal Rule Decision

11  441, a decision by the Central District of California in

12  1998.  There the Court held that where a single interrogatory

13  request disclosure of all information which forms the basis

14  for denying requests for admission, each denied request will

15  cons -- will be considered a separate interrogatory and count

16  against the numerical limit of 25.

17           MR. STOCKER:  I haven't had that objection raised

18  by defense counsel.

19           THE COURT:  Well, I understand, but I'm just --

20  I'm just putting you on notice in the future.  Just be aware

21  that that is I think good and very persuasive case law.  And

22  that might be another reason why you want to put off serving

23  requests for admissions until a little later down the road.

24  But --

25           MR. STOCKER:  I mean --

 1          THE COURT:  -- I think that I'm not -- I would not

 2   be inclined to grant a motion to compel a response to request

 3   for admission Number 17.  But having said that, I think it

 4   should be possible to draft a more narrowly focused request

 5   for admission which covers much of the same subject.  So I

 6   would probably be willing to grant a motion to compel if, for

 7   instance, it said, Admit that MVM modified contractual

 8   agreements entered into with other members of the Scorpion

 9   team.  I think that might very well be relevant, because if

10   you look -- if you look at the Advisory Committee Notes to

11   Rule 26(b)(1), the Advisory Committee Notes say that

12   relevance for purposes of discovery could include other

13   similar acts.  I mean, I wouldn't serve these requests for

14   admission now, but I -- it's not my place necessarily to

15   second-guess counsel.  I think this -- I think this request

16   for admission is probably too broad.  I think it is possible,

17   however, to draft a more narrowly focused request for

18   admission that might very well be appropriate at some point.

19          MR. STOCKER:  Okay.  I follow your logic, Your

20   Honor.  If I can just comment.  The reason this discovery

21   is -- is as expensive as it is, is -- is that depositions --

22   and I would prefer to do depositions.  I'd prefer to do two

23   or three weeks of them if I had a blank check, but I don't

24   have a blank check.  And the -- and that's not the Court's

25   problem.  But -- or defendant's problem.  But the people that

 1   need to be deposed are literally all over the world.  And we

 2   knew this going into the case.  So I'm doing the best I can

 3   to get what I can through written discovery.

 4         THE COURT:  Well, I understand, and I appreciate

 5   your dilemma.  And -- and -- and I realize that this could be

 6   potentially very expensive, but I don't know that I -- the

 7   fact that this is a cheaper alternative to discovery doesn't

 8   confer -- convert a bad interrogatory to a good

 9   interrogatory.

10         MR. STOCKER:  I absolutely agree.

11         THE COURT:  I can't justify a bad interrogatory on

12   the -- on the grounds of impecunious condition.

13         MR. STOCKER:  That's why there's -- whether

14   they're good or bad, that's why it's as expensive as it is.

15         THE COURT:  Okay.  With respect to the

16   interrogatories, the first dispute seems to concern

17   Interrogatory Number 3.  State all reasons and identify all

18   documents supporting your denial of the allegations stated in

19   paragraph 68 of the amended complaint.  Quote, "It was the

20   custom and practice of MVM in the industry to continue such

21   employment agreements."

22         See, now, here again we have a problem because

23   you've got the phrase, "employment agreements," capitalized,

24   and that would suggest that an independent contractor

25   agreement capitalized is different than an employment

 1   agreement.  I don't know exactly which term you're using when
 2   you switch from -- back and forth, but be that as it may.
 3   Such employment agreements for so long as MVM's underlying
 4   contract with its clients continued and there was not good
 5   cause to terminate the employer.  Response.  MVM objects to
 6   this interrogatory on the ground that it's not relevant.  It
 7   is not reasonably calculated to lead to the discovery of
 8   admissible evidence.  In developing a complete response to
 9   the interrogatory as stated, it would be unduly burdensome.
10   Without waiving the objection, MVM states that it denied
11   paragraph 68 because it's not a true statement.  Well, that's
12   a bad response.  I don't know any other way to describe it.
13            First of all, the case law is clear.  If a party
14   objects to an interrogatory or request for production on the
15   grounds that it's unduly burdensome, it's incumbent upon that
16   party to provide a factual basis for that claim of undue
17   burden.  You haven't explained to the plaintiff and you
18   certainly haven't demonstrated to me in this response why
19   it's unduly burdensome.  But unless and until you make the --
20   and the showing is on you.  It is your burden to come forward
21   with facts to convince me that it truly is unduly burdensome.
22   And the irony is, is that there is case law that suggests
23   that an unsubstantiated or boilerplate objection like this
24   could translate into a waiver of the objection.  The other
25   problem that I have with this response is that Rule 33 says

 1  that you have to object to the -- you can object to the

 2  extent that the interrogatory is properly objectionable, but

 3  you have to answer to the extent that it's not objectionable.

 4  Now, you haven't really done that.  I mean, the irony is the

 5  interrogatory says if you disagree or if you deny the

 6  allegation, explain to me why you deny the allegation.  Your

 7  response is in effect -- I mean, I hate to sound frivolous,

 8  but your response is we denied it because we thought it

 9  should be denied.

10          MR. FREIMANN:  Well, Your Honor, but --

11          THE COURT:  But he wants to know the factual basis

12  for that determination.

13          MR. FREIMANN:  Based on the information that we

14  had at the time that we -- based on the information we have

15  now, our client has advised us that it's not the practice,

16  and it's not the --

17          THE COURT:  But -- but he wants to know the basis.

18  In other words, if you -- for instance, if you've talked to

19  your client and your client says this isn't how we conduct

20  business, then he says state all the reasons and identify all

21  the documents.

22          MR. FREIMANN:  Well, I understand that, Your

23  Honor, but just to get back to the -- the first part of the

24  objection, the relevance aspect of this, we don't believe

25  this is relevant at all to plaintiff's claims.  And just to

1    give the Court some context, Mr. Boone was never in this

2    industry prior to signing an -- signing a contract with MVM.

3    He was in the surveillance industry.  He did some electrical

4    work, but he was never in the PSD industry before --

5         THE COURT:  How -- how is that material at all,

6    what he was doing before he affiliated himself with your

7    client?  I mean, he could have been a banker.

8         MR. FREIMANN:  Well, the -- the relevance is at

9    the --

10        THE COURT:  Who cares?

11        MR. FREIMANN:  -- at the time that he -- what's

12   important is what he knew at the time he entered into the

13   contract.  And if he had no knowledge of what the industry

14   standards or customs and practices were at the time that he

15   entered into the contract, then what the -- what, you know,

16   company A or B does is not relevant to his claim at all.

17        THE COURT:  But -- but -- but, counsel, counsel,

18   what -- the scope of discovery under 26(b) is broader than

19   what may be ultimately admissible at trial.  So whether he

20   personally knew about it or not, for purposes of this

21   discussion I don't think it's germane.  It doesn't matter

22   whether he was -- this allegation was that there was a custom

23   and practice within the industry.  It -- the -- the

24   allegation in paragraph 68 doesn't speak to, and it's not

25   dependent upon, how long he was in the industry.  He

1   basically -- what this allegation says, at the time he joined

2   the industry there was a custom and practice in place.

3           MR. FREIMANN:  Your Honor, what also he's asking

4   us to do is to prove the negative.  If we say that there is

5   no custom and practice, that this is -- you know, that you're

6   supposed to be kept on your contract, we say, no, you're not.

7   That's not the custom and practice.  How essentially, you

8   know, are we supposed to go back and prove that this thing

9   that does not exist is there?

10          THE COURT:  Well, I mean, basically what I would

11  do is, is I would -- I would -- I mean, it -- it -- it's a

12  conundrum, how you prove a negative.  But basically what you

13  do is you say, you know, there was no -- we object.  We

14  object to the extent that the allegation is premised on a

15  misstatement of fact.  There was no custom or practice within

16  MVM and the industry.  Now, to the extent that there -- to

17  the extent that MVM had a policy, you give them that policy,

18  and what you do is you say, here is the written policy that

19  MVM had, and then you tell them MVM had no procedure, you

20  know, written procedure or practice that deviated from this

21  written policy.  That's all you can do.  But when the -- when

22  the interrogatory says, State all reasons and identify all

23  documents, your -- your response is, You're wrong, period,

24  end of discussion.  That's after you throw in all these

25  boilerplate objections.  You've going to have to go through

 1   and supplement this response.  I think plaintiff's got a

 2   legitimate beef.

 3          Now, with respect to Interrogatory Number 11, for

 4   each Scorpion PSD team member who resigned, or was released,

 5   or discharged during 2005, including plaintiff, state the

 6   date of discharge or retirement, and state -- describe all

 7   reasons for the discharge or resignation, and identify all

 8   relevant documents.  Well, I mean, here the problem is

 9   that -- again, I think this interrogatory is somewhat

10   problematic because of the way it's written.  It's

11   interesting the formulation.  The first line of this speaks

12   of resignation, release, or discharge.  The second line then

13   speaks of discharge or retirement.  And then the third line

14   speaks of discharge or resignation.  I mean, it seems to me

15   sort of this shifting, you know -- I mean, what do you want

16   them to -- what do you -- what's the criteria?  Is it the --

17   line one, line two, or line three?  That just is an

18   observation.  It makes it a little difficult for me to try to

19   enforce.  But having made that observation, to the extent

20   this interrogatory applies to individuals other than the

21   plaintiff, well, of course it applies to individuals.  You

22   don't need to say that.  MVM objects to this interrogatory

23   based on the fact that it's vague, ambiguous, unduly

24   burdensome.  Don't do that anymore.  Strike from your lexicon

25   or word processor any reference to unduly burdensome unless

1   you are prepared to submit a factual affidavit from yourself

2   or your client explaining why it's unduly burdensome.  That

3   boilerplate recitation tells me nothing.  And it's not

4   relevant to plaintiff's claims or reasonably calculated to

5   lead to the discovery of admissible evidence.  Plaintiff was

6   not an employee.  Well, the problem is the phrase doesn't

7   speak of employment.  It says for each team member.  So what

8   you should have said, plaintiff was not a team member, and

9   obviously that's not correct.  So the fact that you use the

10  word "employee" really begs the question.  Whatever he was,

11  then -- the interrogatory isn't addressed to what his status

12  was.  The interrogatory speaks to how that status, whatever

13  it was, came to an end.  So you say plaintiff was not an

14  employee and he did not resign, nor was he released or

15  discharged.  Well, what's left?  If he didn't resign, he

16  wasn't released, he wasn't discharged, he's presumably still

17  on the payroll?

18          MR. FREIMANN:  The contract ended.

19          THE COURT:  Okay.  Okay.  Well, I guess -- right.

20  Additionally, this interrogatory seeks information from the

21  contractor file.  There -- well, we've talked about that.

22  The fact that they're private and confidential doesn't

23  necessarily preclude discovery.  But the difficulty is the --

24  the information about other team members could be potentially

25  relevant.

Page 24

```
 1              MR. FREIMANN:  Well, Your Honor --

 2              THE COURT:  So, for instance, hypothetically, what

 3     if the plaintiff is alleging that he was terminated or he

 4     wasn't rehired or his contract wasn't renewed because he was

 5     a whistle-blower?  Because he raised a stink?  Because he

 6     complaint had about other members of the team?

 7              MR. FREIMANN:  He hasn't raised that complaint

 8     though, Your Honor.  His three claims are --

 9              THE CLERK:  Mr. Freimann -- excuse me, Judge.

10              MR. FREIMANN:  I'm sorry.

11              THE CLERK:  I need you a little bit closer.

12              THE COURT:  Yeah.  You can't rock back.

13              MR. FREIMANN:  His three claims deal with -- or

14     two of them deal with a contract claim, a breach of contract,

15     and a third one is a public policy claim.

16              THE COURT:  Right.  And the public policy is he --

17     he complained about the conduct of some of the other team

18     members.  And he was -- his contract wasn't renewed.  He

19     wasn't sent back because he complained about misconduct on

20     the part of other team members.  So it might very well be

21     relevant what happened to those other team members.  Were

22     they kept on --

23              MR. FREIMANN:  Well --

24              THE COURT:  -- despite his complaints, or were

25     they sort of gently and -- and under the rug ushered out of
```

1    the country?

2         MR. FREIMANN:  The -- the lack of relevance that

3    we see from -- from this particular interrogatory is -- what

4    the plaintiff is attempting to do in our opinion is create a

5    qualification thing where everybody else on the team was not

6    asked back or not -- did not redeploy with the Scorpion team

7    because they were either medically disqualified or did not

8    meet certain standards.  And MVM from the very beginning has

9    not -- it never stated that Mr. Boone was not redeployed with

10   the team because he did not meet certain standards or because

11   of his physical abilities.  It was he did not fit in.  There

12   was a lack of chemistry within the team, so --

13        THE COURT:  And so -- so -- but -- but -- but it

14   is possible -- in other words, what he's trying to say is, I

15   know the stated reason.  I know what MVM is claiming, but I

16   want to find out what happened to these other people.  I

17   mean, did -- were they -- was the determination made that the

18   other team members fit in because they're willing to bend the

19   rules?  I didn't fit in because I wouldn't bend the rules.

20        MR. FREIMANN:  Well, this isn't a discrimination

21   claim either though, Your Honor.  This is a straightforward

22   breach of contract claim.  If he had raised a --

23        THE COURT:  No.  One claim is a straightforward

24   breach of contract claim.  He's also alleging that he was

25   discharged in violation of public policy.  Now, I readily

Page 26

```
 1   concede that that's an interesting issue, and I'll leave it
 2   to somebody else to straighten that one out.  But what he's
 3   saying is, is that he was terminated because he was blowing
 4   the whistle on other members of the team in Iraq.  And while
 5   he was squaring his corners and he was playing by the rules,
 6   other people weren't.  And the guy that was squaring the
 7   corners and playing by the rules wasn't asked back.  He wants
 8   to find out if these other folks were similarly excused or
 9   not rehired.  He wants to find -- he -- counsel, understand,
10   you don't necessarily have to agree with the premise of the
11   interrogatory, and I'm sure you don't agree with the premise
12   of the interrogatory.  My question is, does this
13   interrogatory seek relevant information as relevance is
14   decide -- defined under 26(b)(1)?  I think it does, whether
15   the plaintiff was an employee or an independent contractor or
16   just a volunteer.
17            Number -- what's left?  Number 12.  Identify the
18   army unit and its commander that appeared on the scene of the
19   attack on Scorpion PSD team on November 20, 2004, shortly
20   after the detonation of the IED.  Explain to me how this is
21   relevant, counsel.
22            MR. STOCKER:  Your Honor, if we can find out who
23   that was, we might be able through an FOI, Freedom of
24   Information Act, or whatever, get an army report on what
25   happened on that bridge on November 20th of '04 and get more
```

1    information on -- on exactly how the Scorpion team behaved,

2    what the army thought of it.  We don't know.  But if we --

3              THE COURT:  But I guess my question -- well --

4              MR. STOCKER:  You know, we're trying to find out

5    the army unit, the army commander.  What -- what unit was

6    there?  It was an MP unit.  That's all we know.  Does

7    somebody -- does Pietragallo, the team leader, did he have

8    further interaction with them?  Was there -- you know,

9    somebody must know.  We don't know who that team was.  But

10   the information I have is that whenever there's a firefight

11   the army unit involved makes a report of some sort.

12             THE COURT:  I don't -- I mean, I spent five years

13   in the military.  You shouldn't assume that --

14             MR. STOCKER:  Well --

15             THE COURT:  -- that always happens.

16             MR. STOCKER:  -- that may be an optimistic

17   assumption.  But that's our information.  We're just trying

18   to get the army report basically and that's the way to do it.

19             THE COURT:  Well, see, the problem is all they're

20   required to do is undertake a reasonable investigation based

21   upon information that's readily available.  I don't see

22   anything in Rule 33 that requires them to contact CENTCOM in

23   Baghdad and say, you know, tell me what all of your

24   operational units were doing on this particular day and where

25   they were.  If -- if they know -- if they know who this

1    army -- if they know the army unit and they know the

2    commander, I think you should produce it.  But, I mean,

3    they're not required to jump through innumerable hoops.  If

4    they have the information I think it's probably potentially

5    discoverable.  But I don't know.  Even if, for instance, this

6    unit prepared a report and sent it up the chain of command, I

7    don't know that MVM would have gotten a copy of that

8    operational report from some platoon sergeant.

9            MR. STOCKER:  Yeah.  Your Honor, I mean, all of

10   your comments are appropriate.  I've asked them to identify

11   them if they -- like I say, I don't know whether the team

12   leader had further interaction, knew who this army unit was.

13   There was a fairly close operational environment between

14   these MP units and the private security guards.  So, you

15   know, did they see them in the bar later on?  Did they talk

16   to them?  I -- we're trying to find out.  If they know, fine,

17   if --

18           THE COURT:  I know.  But, see, the problem is the

19   only person you've sued is MVM.

20           MR. STOCKER:  Well --

21           THE COURT:  And MVM is only required to make a

22   reasonable investigation.  I don't know under Rule 33 they're

23   required to go back and talk to former independent

24   contractors.

25           MR. STOCKER:  Well, but Mr. -- yeah.

Page 29

```
 1          THE COURT:  They're not required to necessarily do
 2    your investigation.
 3          MR. STOCKER:  I understand.
 4          THE COURT:  I'll require you to supplement the
 5    interrogatory, Number 12.
 6          MR. FREIMANN:  Your Honor, can I be heard on
 7    Number 12?
 8          THE COURT:  Yeah.  I'm satisfied it's potentially
 9    relevant.
10          MR. FREIMANN:  Okay.  Well, I'm just going to
11    argue that the relevance part that we disagree with the
12    plaintiff's attorney is -- essentially what he's trying to do
13    is litigate the after action report.
14          THE COURT:  No, he's not.  He's not trying to
15    litigate anything.  All he's trying to do is develop
16    information he may choose to use at trial.  Don't -- again,
17    don't assume that just because you have to disclose the name
18    of the unit that it's going to go any further than that.  But
19    to the extent that your employer knows the army unit or unit
20    commander who arrived on the scene shortly after this IED
21    incident, I don't think it's unnecessarily burdensome to
22    disclose that.  And I'm not prepared to say absolutely and
23    categorically that it's not relevant, or more importantly,
24    that it may not lead to the discovery of admissible evidence.
25          MR. FREIMANN:  I guess the way we look at it right
```

1    now, and this may differ obviously in the Court's opinion,

2    it's somewhat of a three-part analysis.  One, this would only

3    fall -- I think we could agree, this would only fall under

4    the public policy claim.

5              THE COURT:  Right.

6              MR. FREIMANN:  So, Number 1, did plaintiff make a

7    complaint?  Not whether the complaint had any accuracy, not

8    whether what he's complaining about was legitimate.  Was

9    there a complaint made?  If so, did MVM do something about

10   this complaint?  And if they did something about this

11   complaint, did that violate either a -- did that violate

12   public policy?  So to go beyond the scope of whether or not a

13   complaint was made about this particular incident, we don't

14   believe this is relevant to the public policy claim.

15             THE COURT:  Well, but it could be because, for

16   instance, if MVM knows the unit commander or the unit that

17   arrived on the scene, then it might lead to requests for

18   production.  To the extent that you had -- to the extent that

19   you know the unit commander, did you or did MVM at some point

20   contact that unit commander to get his or her description or

21   understanding of the events?  It could lead to admissible

22   evidence.  It's just one step in what could be either a long

23   chain or a very small chain.  But all he's saying in this

24   interrogatory is if you know the unit or the unit commander,

25   tell me who it is.  It could lead to admissible evidence.

1           With respect to 15, 16, 17, 18, 19, 20 -- 15, for

2    every statement contained in plaintiff's statement concerning

3    the IED attack that MVM -- including disputes or beliefs --

4    well, I don't understand.  I mean, this interrogatory doesn't

5    make any sense in some respects.  You say for every statement

6    contained in plaintiff's statement that MVM, including

7    Pietragallo.  Is Mr. Pietragallo still with that company?

8           MR. STOCKER:  Yes.

9           THE COURT:  He is?

10          MR. STOCKER:  Yes.

11          THE COURT:  But he's not a party to this case.  If

12   you want to know what Pietragallo disputes, depose

13   Mr. Pietragallo.  He is not a party to this case.  And the

14   way this thing is drafted it sort of presumes that MVM and

15   Pietragallo dispute or believe the same things.  So I would

16   not be inclined to grant the motion -- a motion to compel to

17   the extent that this -- this seeks information about

18   Mr. Pietragallo's beliefs.

19          MR. STOCKER:  I --

20          THE COURT:  MVM can discuss its beliefs.

21          MR. STOCKER:  I guess the way I worded that was

22   that MVM including Pietragallo, so --

23          THE COURT:  I know, but -- but -- but, no, if you

24   want to know what MVM knows, you're entitled to serve an

25   interrogatory on a party.  If you want to know what

1    Pietragallo thinks or disputes, depose Mr. Pietragallo, or

2    join him in the lawsuit if you can.  But setting aside that

3    problem, for every statement that MVM disputes or believes is

4    not true, describe why you believe.  So do I understand this

5    properly, there is a statement that your client prepared

6    regarding this attack?

7          MR. STOCKER:  That's correct.

8          THE COURT:  All right.  So I think what you meant,

9    for every aspect of plaintiff's statement -- see, part of the

10   problem is you use "statement" two different ways.  For every

11   aspect of plaintiff's statement governing that MVM disputes

12   or believes is not true, describe why you believe it is not

13   true and identify all documents supporting such belief.  MVM

14   objects to this interrogatory on the grounds that it's

15   irrelevant to the plaintiff's claims.  It is not reasonably

16   calculated -- answer it.  This is just -- you're just not

17   going to get any mileage with this kind of boilerplate

18   objection.  It is potentially relevant to his public policy

19   argument.  And you haven't explained to me how it would be

20   unduly burdensome to simply have MVM, your client, articulate

21   what it disagrees about.  How is that unduly burdensome?  You

22   go to your client and say, Here's his statement.  Do you

23   dispute any of this?  They'll either tell you we do or we

24   don't.

25          MR. FREIMANN:  I mean, Your Honor, there are --

1  there is, you know, a version of the after action report that

2  describes events as MVM represents them.  So there already is

3  information out there that --

4        THE COURT:  But -- but, counsel, I'm more than

5  happy to cite you case law that says just because this

6  information is available in some other form doesn't relieve

7  you of an obligation to answer an interrogatory.  It may be

8  in another form, but this interrogatory requires your client

9  to take a position and certify it, so please do.

10        MR. FREIMANN:  Okay.  I guess as to -- to make the

11  record to -- we were -- our concern with this one, again, is

12  the relevance of -- and I know Your -- Your Honor's position

13  on this, but the -- for plaintiff to be able to start to

14  litigate the veracity or the factual history of what happened

15  on November --

16        THE COURT:  He's not -- he's not litigating it.

17  He's simply trying to -- to plumb the depths of all the

18  available information.  And whether or not he's allowed to

19  litigate it at some point in some form remains to be seen.

20  But right now he has a claim.  He has a claim that he was

21  discharged in violation of public policy having made certain

22  accusations about coworkers relating to this IED attack.

23  Now, I think it is relevant to the extent that his employer,

24  MVM, chose to dispute -- in other words, it sounds to me,

25  based on what you're telling me, is there were two versions

 1   of this event.

 2              MR. FREIMANN:  Yes, sir.

 3              THE COURT:  There's the plaintiff's version and

 4   the MVM version.  And -- and plaintiff concedes that there --

 5   I mean, the very interrogatory recognizes there may be a

 6   dispute between the plaintiff's version and the MVM version.

 7   What this interrogatory says is if MVM disagrees with the

 8   plaintiff on what happened during this attack, explain to me

 9   why MVM believes its version and not the plaintiff's version.

10   That's in a nutshell what this interrogatory asks.  It's not

11   saying MVM has to agree with the defendant -- the plaintiff.

12   It's just saying if MVM chooses not to believe the plaintiff,

13   tell us why it reached that decision.  What was it about the

14   plaintiff's version that MVM disagreed with, and why did they

15   disagree with those versions?  And it could be something as

16   simple as we had six guys on a team.  Five guys said A and

17   Boone said B, or it could be something like five guys say A,

18   Boone says B, and based upon our understanding of the attack

19   and where people were positioned during the attack, it seems

20   highly unlikely that Mr. Boone was physically in a position

21   where he could have seen the events he now purports to

22   describe.  There's a whole reason, a whole series of reasons

23   I suppose that MVM could ultimately decide Boone was wrong

24   and these five guys were right.  He simply wants you to

25   explain why you made that determination, why your client made

Page 35

 1   that determination.  He's not asking you to agree with

 2   Mr. Boone's version of events.  So you'll need to supplement

 3   number 15.

 4            Number 16, identify all supporting documents, I

 5   think you left out a word, that describe all facts supporting

 6   MVM's denial of the allegations in 159 of the Amended

 7   Complaint that the AAR is a fraudulent -- the after action

 8   report is a fraudulent and false report.  Well, I mean, to

 9   some extent there's a -- there's -- what's the difference

10   between 15 and 16?  Because 15 says describe why you believe

11   it's not true and identify all documents that support your

12   belief.  It's the -- I mean, both 15 and 16 deal with the

13   after action report in a sense, don't they?

14            MR. STOCKER:  That's correct, Your Honor.

15   They're -- they're just diff --

16            THE COURT:  So do you need both of these?

17            MR. STOCKER:  They're -- they're basically similar

18   questions, very similar.

19            THE COURT:  Yeah.  They're virtually identical --

20            MR. STOCKER:  Yeah.

21            THE COURT:  -- except for the -- the --

22            MR. STOCKER:  Yeah.

23            THE COURT:  -- so --

24            MR. STOCKER:  Yeah, but --

25            THE COURT:  -- answer one or the other.  I'll let

1    you pick.  You can -- I would suggest you answer 15.  I'm not

2    going to require you to supplement your response to 16

3    because I think it's duplicative.

4         17, identify all supporting documents, describe

5    all facts supporting denial of the allegations in 172.  The

6    improper romantic relationship compromises -- oh, man.  This

7    lawsuit could drag on longer than our presence in Iraq.

8    Identify all supporting documents describing all facts

9    supporting MVM's denial of the allegations that the improper

10   romantic relationship, quote, "compromises the mission."

11   Okay.  MVM objects to this interrogatory in that it's

12   irrelevant, it's not reasonably calculated, is vague,

13   ambiguous, and unduly burdensome.  Well, I'm going to

14   disregard the unduly burdensome objection because, again,

15   it's not substantiated.  I'll require you to identify all --

16   I'm assuming you did deny that allegation?

17         MR. FREIMANN:  Yes, sir.

18         THE COURT:  Just explain the facts that support

19   the denial.  That's all he's asking you to do.

20         18.  Identify all supporting documents and

21   describe all facts supporting MVM's denial of the allegations

22   in paragraphs 174 and 176, that the possession of illegal

23   weapons violate MVM -- that such illegal weapons posed a

24   safety hazard to team members and other personnel.  I don't

25   know where that quote begins, but -- and that such illegal

1    weapons were purchased with US funds.  MVM objects to this

2    interrogatory as irrelevant.  Go ahead and answer that one.

3    To the extent that you deny those allegations, explain the

4    basis for the denial.  I mean, see, the problem is, counsel,

5    it's difficult to say that -- that the basis for your denial

6    is irrelevant.  I mean, it's relevant to the extent that it's

7    a factual allegation that he puts in his complaint.

8            MR. FREIMANN:  Right.

9            THE COURT:  I mean, I'm trying to understand how

10   you can find that the basis for denying the allegation is

11   irrelevant --

12           MR. FREIMANN:  Well, Your Honor --

13           THE COURT:  -- when the allegation is in the

14   complaint.

15           MR. FREIMANN:  I guess it is our hope for the

16   Court to focus the -- the plaintiff's claims so we wouldn't

17   have this long-drawn-out lawsuit where we could focus --

18   focus us in not necessarily on the underlying acts of what

19   happened in Iraq, but whether or not plaintiff complained,

20   whether we took action against him.

21           THE COURT:  Counsel, counsel, I'm -- I'm not

22   necessarily disputing your hopes and aspirations, but what

23   I'm telling you is I don't think hopes and aspirations are a

24   legitimate basis for objecting under Rule 33.  I can't say

25   that these allegations are irrelevant because they're in the

1    complaint.

2          MR. FREIMANN:  Right.  And, Your Honor, the other

3    question is whether the allegation itself is relevant.

4          THE COURT:  Well, the allegations -- and it's --

5    counsel, your -- your argument becomes highly circular

6    because for purposes of 26(b)(1), relevance is defined by the

7    claims.  Now, he's asked you to explain why you denied an

8    allegation that forms the basis for one of his claims.

9    You're now saying that that request is irrelevant because the

10   allegation and the claim are irrelevant.  Well, the claim

11   isn't irrelevant.  It's still in the lawsuit.  Don't you see

12   this becomes a rather circular analysis?  Under that theory

13   no defendant would ever answer an interrogatory because a

14   defendant would simply say I think that allegation is

15   irrelevant; I'm not going to tell you what you want to know;

16   and you're only going to get the information after the Court

17   confirms that the allegation stays in the case.  Pretrial

18   management becomes impossible.  So I'm afraid you'll have to

19   supplement 18.

20          19.  Identify all supporting documents and

21   describe every action taken in response to the after action

22   report.  Well, answer 19, too.  I mean, this is -- we -- I

23   see a real pattern developing here.  You need to supplement

24   all of these.

25          MR. FREIMANN:  Your Honor, for Number 19, this is

Page 39

 1   a different employee altogether, a different after action

 2   report.  This has nothing to do with Mr. Boone or the after

 3   action --

 4             THE COURT:  He's not a member of the team?

 5             MR. FREIMANN:  Not at the -- not for the relevant

 6   time that --

 7             THE COURT:  Okay.  Mr. -- I'm sorry, explain the

 8   relevance to this one.

 9             MR. STOCKER:  The reason that's relevant, Your

10   Honor, is because there was -- there were similar analogous

11   problems in an earlier deployment.  Mr. Alizaldi (phonetic)

12   wrote an after action report at the end of that deployment

13   which was in July of '04.  Mr. Boone complained about those

14   things that happened in the March through May, or whenever it

15   was, early '04.  MVM took action in response to his

16   complaints and basically thanked him for them by bringing him

17   back on.  He said I can't work if you have these kinds of

18   procedures and these kinds of operations and these kinds of

19   people.  Boone complained.  He said I can't go back.  MVM

20   corrected the problems, actually discharged two other people,

21   brought Boone back.  So it's relevant because Boone then

22   thought, okay, MVM is a good company.  They're honorable.

23   They go by the book.  They'll -- they'll listen to me.

24   Similar -- perhaps worse things happened in the fall

25   deployment.  Boone complained and then was fired.  So it's

1  relevant in that there's a pattern here, and I'd like to know

2  what happened in the first deployment to find out why it

3  didn't happen in the second.

4           THE COURT:  I would probably answer that one.

5           MR. FREIMANN:  Answer that one?

6           THE COURT:  Yeah.  20.  Identify all supporting

7  documents and describe the proper procedures for writing an

8  action -- after action report for the IED attack on

9  November 20, 2004.  Defendant objects to this interrog.

10 Answer 20.  If there are procedures, just describe what the

11 procedures are.  I mean, that's all he's asking you to do.

12          23.  Describe in detail and identify all related

13 and supporting documents, all background checks MVM routinely

14 performs on -- including drug screens, criminal background

15 screens, personal and professional reference checks, and

16 physical fitness screenings.  Explain to me how this is

17 relevant, counsel.

18          MR. STOCKER:  Again, this is --

19          THE COURT:  Because they, in fact, did hire your

20 client.

21          MR. STOCKER:  They hired my client, but we're --

22 I'm trying to find out whether they actually went through all

23 the screening that they -- that MVM required, and required in

24 their so-called contract of the other five members.  And I

25 can, you know --

1          THE COURT:  But, again, I mean, your client is

2    alleging a breach of his contract.  How is this relevant to

3    whether or not they breached his contract?

4          MR. STOCKER:  I think it goes back to that

5    question of whether there even was a contract because if MVM

6    didn't do what it said it was going to do in its contract --

7          THE COURT:  Yeah.  But the only question is

8    whether there was a contract with your client.

9          MR. STOCKER:  Well, it seems to me in my thinking

10   at least that if they didn't follow their contract with

11   anybody, but they're defending themselves by saying we have

12   this independent contractor agreement and we can terminate it

13   after the third rotation and we did, because that's what it

14   says, how come they can pick and choose what pieces they want

15   to enforce or try to enforce?  So if they didn't have all

16   these background checks, saddle Boone with other team members

17   who were on drugs, who weren't physically fit, who didn't

18   meet any of the criteria required, and yet they were there

19   and they wrote the after action report that Boone claims is

20   fraudulent, and then covered themselves --

21          THE COURT:  Yeah.  But, see -- see --

22          MR. STOCKER:  -- or covering themselves --

23          THE COURT:  -- and, again, I haven't seen the

24   contract.  See, that argument might be more relevant if they

25   represented to Mr. Boone that as an independent contractor

1    they were going to team him with top-notch, first-rate

2    people, the best of the best, the cream of the crop.

3            MR. STOCKER:  I think they did say that.  They

4    told him that.

5            THE COURT:  Well, where -- where do you allege

6    that in your complaint?

7            MR. STOCKER:  I don't know that that's

8    specifically --

9            THE COURT:  Well, that's --

10           MR. STOCKER:  -- in the complaint.

11           THE COURT:  -- see, that's -- you know, I got --

12   you know, at some point I am bound by the allegations in the

13   complaint, the specific claims in your complaint.  At this

14   point what I would be inclined to do if there was a motion to

15   compel, I would read Number 23 in a more generic way.  It

16   was -- all he's basically asking for is give me the

17   information that MVM follows as a general matter in terms of

18   doing background checks.  This -- I don't think this

19   interrogatory is -- is referring to any particular

20   individual.  It simply says as a general customary practice,

21   tell me what screenings you do.  I would probably be inclined

22   to allow it on that basis.

23           Number 24.  Identify every MVM employee or

24   contractor who signed an independent contract or agreement

25   from January 1, 2004, to present.  State the dates that each

 1   employee, individual has worked for MVM in Iraq, and the

 2   number of rotations each individual has had in Iraq for MVM.

 3   MVM objects to this interrogatory on the grounds that it's

 4   irrelevant.  It's not reasonably calculated -- I would go

 5   ahead and answer 24.  I just -- I can't help you when you

 6   crank out these boilerplate objections.  Theoretically, he is

 7   alleging breach of contract.  He is alleging breach of

 8   contract in part based upon this public policy argument,

 9   based upon his client's interactions with MVM and other team

10   members.  So all he's saying is, Look, I want to know to the

11   extent that there were other employees assigned in Iraq doing

12   comparable work, I want to know, you know, what happened to

13   those folks.  But I think that the interrogatory is probably

14   overbroad because MVM may have a lot of different employees

15   doing different things.  So I would probably narrow this

16   interrogatory to MVM employees or contractors performing

17   similar functions to Mr. Boone's.

18          MR. STOCKER:  I won't object to that narrowing.  I

19   mean --

20          THE COURT:  Well, at this point I'm simply giving

21   you sort of advisory views.  I would suggest you confer a

22   little more with opposing counsel.

23          MR. FREIMANN:  And, Your Honor, could we possibly

24   limit that just to the Scorpion team?  So that's the team

25   that Mr. Boone was on.

Page 44

```
 1          THE COURT:  Well, at this point I don't -- at this
 2   point I don't know how many teams there were.  I don't know
 3   how many individuals there were.  I'm not sure that it would
 4   be necessarily burdensome if there were only three teams
 5   during the relevant time period of six individuals each.
 6   That's only 18 folks.
 7          MR. STOCKER:  Yeah.  There were two teams, Viper
 8   and Scorpion.
 9          THE COURT:  I'm -- I'm not going to limit it to
10   his team.  I'll limit it by the function of the individual,
11   not by the team.
12          Now, moving this along, with respect to all of
13   these requests for production, Number 2, for each member of
14   the team produce their entire personnel file, including but
15   not limited to all documents pertaining to or relating to in
16   any way their engagement as an employee or independent
17   contractor.  And, again, the problem I've got, counsel, is
18   you can object to the extent that the request is
19   objectionable.  To the extent it's not objectionable, you
20   have to produce documents.  As I understand it here, your
21   response suggests that because these folks are independent
22   contractors, and because MVM does not have a, quote, unquote,
23   personnel file for each of these folks, you have nothing to
24   produce.
25          MR. FREIMANN:  That's correct.
```

 1          THE COURT:  Is that the thrust of your position?

 2          MR. FREIMANN:  Yes, sir.

 3          THE COURT:  Okay.  Well, again, you haven't

 4   explained to me why the request is unduly burdensome so I'm

 5   not persuaded by that objection at all.  I -- I can not

 6   foreclose the possibility this information could lead to the

 7   discovery of admissible evidence.  If it were me and I was

 8   answering this, I would have probably objected to the

 9   reference to personnel files.  I then would have said, but I

10   understand the types of documents that you're looking for.

11   To the extent that MVM maintains those documents in some form

12   or place other than a personnel file, we will look past the

13   misnomer and we'll produce the substantive documents that

14   you're looking for.  If the only objection to this is you're

15   seizing upon the phrase, "personnel file," and because they

16   don't have a magical document called, "personnel file,"

17   there's no reason to produce the otherwise relevant

18   information, that's probably not a strong position.  Because

19   the case law says that you have to construe a request for

20   production in a reasonable manner.  And he clearly tells

21   you -- in other words, if he had not included the phrase,

22   "personnel file," if he had simply said for each member of

23   the team, including plaintiff, produce all documents

24   pertaining to or relating in any way to their engagement, you

25   really wouldn't have much of an objection, would you?  So

1    what you've done is you've seized on the magic words,

2    "personnel file," to say because you don't have a piece of

3    paper labeled that, we don't have to give you anything.  I

4    think that subverts the purpose of Rule 34.  So I would tell

5    you to go back and look at Number 2 again.

6              Number 3.  Produce all documents that were used as

7    background authority, form or drafts, for the independent

8    contractor agreement, a copy of which is attached.  Objects

9    to this on the grounds that it's vague.  Well, it may not be

10   very grammatical, but I don't know that it's vague.

11   Ambiguous, irrelevant.  It's not reasonable to lead -- okay.

12   At least you didn't claim this was unduly burdensome.

13             MR. FREIMANN:  No, sir.

14             THE COURT:  Okay.  Explain to me the relevance of

15   drafts.  I mean, he signed what he signed.

16             MR. STOCKER:  He signed what he signed, Your

17   Honor, because we believe that the document he signed was an

18   identical document to what he had brought with him from a

19   prior employer that MVM looked at and simply changed the

20   name.  And he looked at it or glanced at it and believed that

21   he was signing what he had been used to signing -- or what he

22   had worked under before which had different -- it made him an

23   employee and not an independent contractor.  So the argument

24   is, well, if they took this thing and basically changed the

25   heading on it, and how is Boone supposed to know what it is?

```
 1          THE COURT:  He reads it.  That's how anybody who
 2  signs a contract knows.
 3          MR. STOCKER:  Well, I --
 4          THE COURT:  You -- you take the time to sit there
 5  and read it.
 6          MR. STOCKER:  I understand that.  He didn't do
 7  that.
 8          THE COURT:  Well --
 9          MR. STOCKER:  He wasn't given the time.
10          THE COURT:  What do you mean he wasn't given time?
11          MR. STOCKER:  He wasn't given the time.  They were
12  deploying.
13          THE COURT:  If -- counsel, counsel, if somebody
14  came to you and said I'll hire you and you've got 30 seconds
15  to make a decision, is that really the kind of employer you'd
16  want to be with?
17          MR. STOCKER:  He had been hired based on this
18  telephone conversation a few -- a week or two before.
19          THE COURT:  I don't see -- he -- whatever he
20  signed is what he signed.  I'm not persuaded that this is
21  particularly relevant.
22          Produce all -- Number 5.  Produce all documents
23  evidencing approval by CENTCOM, the United States government,
24  and/or MVM of each and every weapon obtained by, carried by,
25  or otherwise held by.  Holy smokes.  Are you serious about
```

1    wanting this?  Any weapon held by.

2            MR. STOCKER:  One of Boone's complaints is that

3    there are many illegal weapons being carried and used by this

4    team that were acquired in Baghdad, Chinese hand grenades,

5    for example.  That were being stored in the US Embassy under

6    their desk.  There is a rule, as far as we can tell, that

7    CENTCOM required -- CENTCOM which is Central Command out

8    of --

9            THE COURT:  I know what CENTCOM is.

10           MR. STOCKER:  -- Qatar, was required to approve

11   any weapons carried by private security contractors.  I'd

12   like to know what weapons were approved for these guys.  And

13   if they had all these other weapons that were not approved,

14   then I think Boone's complaint is justified.

15           MR. FREIMANN:  Well, Your Honor, first of all, he

16   didn't ask that question.  The question that he asked was to

17   produce each and every -- or any weapon obtained by, carried

18   by, or otherwise held by which is --

19           THE COURT:  Yeah.  See, the problem is the phrase,

20   "otherwise held by."  I mean, say, for instance, you've got a

21   bunch of these guys who are -- who are -- who are, you know,

22   standing around with some uniform enlisted man, and the

23   uniform enlisted man is holding a weapon.  And your client

24   says, Hey, interesting weapon.  Can I just see it for a

25   second?  Literally that's a weapon held.

1           MR. STOCKER:  That's not -- was not the intent,

2    but, you know.

3           THE COURT:  What -- whether or not it was, I

4    mean --

5           MR. STOCKER:  Yeah.

6           THE COURT:  -- but you've got to draft based upon

7    what they think you're going to be looking for.

8           MR. STOCKER:  I'll strike the, "otherwise held

9    by" --

10          THE COURT:  Okay.

11          MR. STOCKER:  -- if that fixes it.

12          THE COURT:  Well, he struck that.

13          MR. FREIMANN:  Well, Your Honor, it's still, I

14   mean, carried by.  That goes to the same argument you had as

15   far as if I carried a weapon for, you know, five minutes, do

16   I have to produce that now, too?

17          THE COURT:  Okay.  So what if he phrases, produce

18   all documents evidencing approval by CENTCOM, the United

19   States government, and/or MVM of each and every weapon

20   obtained by or used by any member of the team in performing

21   their duties?

22          MR. STOCKER:  And I'll go along with that.

23          MR. FREIMANN:  Your Honor, the relevance should be

24   limited to only the weapons that plaintiff has alleged in his

25   complaint that are illegal or either legally obtained or

 1   carried by.

 2          THE COURT:  Yeah.  But, see, the problem is to the

 3   extent that -- to the extent that there are weapons that were

 4   not authorized, even if they're not weapons that are

 5   specifically referenced in the complaint, under 26(b)(1) that

 6   may be discoverable because 26(b)(1) says that you can obtain

 7   discovery of other misconduct.  So the fact that he hasn't

 8   specifically referenced a weapon in the complaint, if he can

 9   demonstrate that there was a general practice of team members

10   using unauthorized weapons, doesn't that lend some probative

11   support for his allegation that Mr. Boone had a legitimate

12   reason to complain?

13          MR. FREIMANN:  Well, and, Your Honor, these are

14   actions that are taking place in Iraq as well.  So for us to

15   be able to answer a question of what each member of the

16   Scorpion team carried on a day-to-day basis or even on an

17   hourly basis in a place that's thousands of miles away,

18   that's going to be a very difficult --

19          THE COURT:  No.  All he's saying is produce

20   documents that you had.  He's not saying you should

21   manufacture documents.  What he's saying is if you have

22   documents in your possession, custody or control that

23   evidence this approval, then he would like you to produce

24   them.  Now, if your client doesn't have any documents

25   evidencing approval, why, I suppose your client could say

 1  that, too.  But you only have to produce what's in your

 2  possession, custody or control.  You -- he's not -- he can

 3  not require you to produce documents in CENTCOM's possession,

 4  custody or control.  He can't require you to produce

 5  documents in the possession of the United States government.

 6            MR. FREIMANN:  Well, Your Honor, we have one other

 7  issue with this, too.  That could lead to a potential -- if

 8  we do dig in and try to discover what documents were

 9  authorized, there is a contract between MVM and the client.

10  That's all we know, the identification of a government

11  entity.  So right now we don't even know the identification,

12  the identity of the client.  And the contract between MVM and

13  the client is confidential, top secret or --

14            THE COURT:  Then -- then -- then that's a

15  different issue.  That's -- that is -- and there's nothing in

16  here that necessarily suggests that we can't deal with that

17  problem through either redaction or a protective order.  If

18  there is classified government information that would be

19  responsive to this request, then you can certainly bring that

20  precise problem to me after you've explored other vehicles

21  with plaintiff's counsel.  But, for instance, if the concern

22  is disclosing the name of the client, I don't know that

23  redaction isn't a possibility.  If there are other -- if --

24  if there's other classified information in a document, I

25  don't know that redaction can't avoid that problem.  But if

1    you're telling me that approval of weapons is classified,

2    well, that might be a different story, but that's

3    specifically not been addressed with me.  I don't know and I

4    suspect you don't know whether or not a piece of paper

5    showing that MVM has authorized a particular independent

6    contractor or employee to carry the following weapons, I

7    don't know that that's classified.  So even if approvals by

8    CENTCOM might be classified or approvals by the United States

9    government, generally at a minimum if MVM has authorized

10   these people to carry particular weapons, Chinese hand

11   grenades or otherwise, provide those documents.  Again, you

12   object to the extent that it's objectionable, but you produce

13   to the extent it's not objectionable.  You really haven't

14   done either.

15           MR. FREIMANN:  So just for clarification, Your

16   Honor, is plaintiff going to narrow the -- the -- the request

17   for production?

18           THE COURT:  Yeah.  I think he's -- he's prepared

19   to narrow it along the lines that I'm suggesting.  Is that a

20   fair characterization?

21           MR. STOCKER:  Yeah.  I think we already deleted

22   "otherwise held."

23           THE COURT:  Well, he's -- he's a little concerned

24   about the phrase, "carried," so that's why I'm suggesting if

25   you say any weapon obtained by or authorized to be used in

1   the performance of their duties, I suspect you're probably

2   going to get what you want.  Because if you get a piece of

3   paper that says Joe Smith was authorized to carry an AR-15,

4   and then your client gets on the witness stand and says, I

5   routinely saw him carrying a rocket-propelled grenade, you've

6   made your point.

7           MR. STOCKER:  Well, yeah.  And if appropriate,

8   Your Honor, I'll just go on the record as agreeing with

9   your --

10          THE COURT:  Oh, that's always appropriate, to

11  agree with me.

12          MR. STOCKER:  Yeah.

13          MR. FREIMANN:  Your Honor, just to further, I

14  guess, narrow -- hopefully narrow down the production, he has

15  all documents evidencing approval.  So, I mean, that could be

16  an email from somebody.  What I'm gathering from the Court is

17  that we need to just produce the actual policy itself that

18  says this is what a member of --

19          THE COURT:  No.  You have to produce all doc -- I

20  don't know how voluminous that is, and you don't know.  Right

21  now I'm going to require you to produce all documents

22  evidencing approval.  Now, I don't know what that means

23  because I don't know what you have.

24          MR. FREIMANN:  Okay.

25          THE COURT:  But, you know, counsel, you'll --

1   right now -- I mean, interestingly enough, this is one where

2   you haven't -- you know, again, you tell me it's unduly

3   burdensome, but you don't show me how.  So right now I'm

4   going to require you to produce all documents.  I'm not going

5   to allow you to pick and choose which approval documents to

6   produce.

7          Number 6.  Produce all documents evidencing or

8   describing all training of each team member by CENTCOM, the

9   US government, and/or MVM on each and every weapon obtained

10  by -- you object to this request.  It's essentially the same

11  objection.

12         MR. FREIMANN:  Well, the --

13         THE COURT:  I'm going to require you to supplement

14  your response to Number 6 consistent with how it's been

15  modified.

16         MR. FREIMANN:  And just for -- how do -- my

17  question is how does the training of what they can carry, how

18  is that relevant to whether or not they carry the weapons?

19  If they were trained on them, that's one thing, but if they

20  were carrying them, then I understand that's a part of --

21  that's an allegation in plaintiff's complaint.

22         THE COURT:  Well, but -- I guess, but the training

23  could be further evidence of approval.  In other words, we

24  are authorizing you to carry an AR-15 and we're going to

25  train you how to use it.  So when you suddenly show up with a

1   rocket-propelled grenade, that might be further evidence it's

2   an unauthorized weapon.

3             MR. FREIMANN:  Okay.  So --

4             THE COURT:  We're going to train you to use the

5   weapons we're authorizing you to use.

6             7.  Produce all documents evidencing or describing

7   all training of each team member on any subject.  What is

8   this?  Produce all documents evidencing or describing all

9   training on any subject received by any member.  I think it's

10  overly broad.  I would not be inclined to -- to require

11  production.

12            MR. STOCKER:  All right.

13            THE COURT:  If you want to take another stab at

14  this, you can, but I'm --

15            MR. STOCKER:  Yeah.  I guess I'm trying to get

16  what -- what -- what training did these guys get.  That's

17  what I'm trying to get at.

18            THE COURT:  Yeah.  But, I mean, it's got to be

19  relevant to the claims.  So personal hygiene training, I'm

20  not particularly interested in.  I'm not sure it's

21  encompassed by your lawsuit, but as -- strictly speaking, it

22  could be encompassed within a request for production.

23            MR. STOCKER:  I'll narrow it.

24            THE COURT:  So I would not be persuaded by a

25  motion to compel on Number 7.

1          Number 8.  Produce all documents exchanged, sent

2    by, and received from between Pietragallo and any MVM

3    staffer.  To the extent this document -- no.  See, that's a

4    loser because, I mean, Pietragallo could have made reference

5    in an email to other members of the team.

6          MR. FREIMANN:  And, Your Honor, we are -- we are

7    willing and we did provide a response to that question as it

8    relates to the plaintiff.  We have discussed with plaintiff's

9    attorney the -- the scope of this request and --

10          THE COURT:  Okay.  It sounds like you're still

11    discussing so we don't need to say more.  I'll expect --

12          MR. FREIMANN:  Well --

13          THE COURT:  -- I'll expect you to fully comply

14    with 7.1A.

15          MR. FREIMANN:  Yes, sir.

16          THE COURT:  I mean, I -- I think communications

17    about other team members could be potentially relevant.

18          MR. FREIMANN:  So I guess our focus -- we gave it

19    a hypothetical when we talked to -- to plaintiff's attorney

20    that, you know, an email from Pietragallo to somebody else

21    saying, Hey, I'm going to go take a jog at 2:00 o'clock; do

22    you want to join me, has no relevance to anything.  And the

23    way he's worded this question that arguably could be

24    included.

25          THE COURT:  Right.  And I think -- and that's why

1   I'm telling you.  I think that read literally, request Number

2   8, is too broad, and your response is too narrow, so I'm

3   inviting you, gentlemen, to take another stab under 7.1A and

4   narrow the request and expand the response and hopefully

5   those two lines will intersect at some point that will not

6   require judicial intervention.

7              Number 9.  Produce all documents related in any

8   way to any debriefing of any Scorpion team member who

9   resigned or was discharged.  It seems a bit broad, but I

10  think there's a germ of relevance here.  And I'm not exactly

11  sure off the top of my head how I would rephrase this.  I

12  think this potentially could reach some relevant information,

13  but I -- I mean, I think it needs to be narrowed somewhat,

14  counsel.  I think what you're trying to get at is debriefings

15  relating to your client or debriefings about the after action

16  report, or --

17             MR. STOCKER:  Apparently, as far as I understand

18  it, Your Honor, when somebody left the contract there was

19  what they called -- they were read off the contract.  And

20  there was some debriefing process that went that -- that --

21  that then may have followed, and there was some notes, or

22  memos, or something memorializing that debriefing process.

23  So, you know, what -- what was -- what did any particular --

24  and I limited to a Scorpion team member.  What did any

25  particular team member say during that debriefing?  And, you

1  know, I -- again, I don't know what's in those documents, but

2  there may be things in there that -- that are directly

3  relevant to the case.

4         MR. FREIMANN:  And, Your Honor, we could see the

5  relevance as it relates to the plaintiff, but --

6         THE COURT:  Yeah.  But it could be relevant as to

7  team members, too.  The plaintiff is alleging that he's a

8  whistle-blower, and the plaintiff is alleging that other

9  people screwed up.  It could possibly be in the debriefing of

10  another team member they say, you know, so and so really was

11  an oddball and he was a loose cannon.  He was a constant

12  problem.

13         MR. FREIMANN:  Well, honestly, Your Honor, the way

14  this -- this request is worded, any debriefing who -- of a

15  member who has resigned or was discharged, but what

16  plaintiff's attorney just said, I guess, would narrow it down

17  to just the -- the reading off of a contract and not -- I

18  mean, if I have a debriefing or if I get talked to, someone

19  from MVM, halfway through my contract and I later resign,

20  then technically I guess I'm a part --

21         THE COURT:  That's what I'm saying, guys.  I

22  need -- look, at some point I've got to move onto this group

23  of people who's sitting very patiently behind you.

24         I think you need to rephrase Number 9, and I think

25  you need to be prepared to produce documents responsive to a

 1   reasonably phrased request for production.

 2           Number 10.

 3           MR. STOCKER:  We can do that.

 4           THE COURT:  Produce all documents evidencing all

 5   revenues.  I mean, there's a whole series of questions about

 6   financial records -- well, there's two actually, Number 10

 7   and Number 11.

 8           MR. STOCKER:  There's 10 and 11.  Yeah.

 9           THE COURT:  Explain to me how this is relevant.

10           MR. STOCKER:  I've had this debate with defense

11   counsel.  I guess I'm just trying to get a handle on where

12   MVM stands on our claims in here for exemplary damages and

13   also for emotional distress for intentional breach.

14           MR. FREIMANN:  And, Your Honor, there's a District

15   of Colorado case that says if it's -- if it's based on state

16   claims, then the relevance -- the financial statements are

17   not relevant as they relate to state claims.  And --

18           THE COURT:  Yeah.  My sense is right now I'm not

19   ruling.  If you want to file a motion to compel, I suppose

20   you could.  I don't know that I would push it, but I'll leave

21   that up to you to decide.

22           Number 13.  Produce every independent contract

23   agreement signed between January 1, 2004, and present.

24   Objects to this request.  This request is not relevant.  I

25   would require you to produce -- I probably, if push came to

 1  shove, I'd require you to produce documents, independent

 2  contractor agreements for anybody on the Scorpion team.

 3          MR. FREIMANN:  Through the time that Boone was

 4  there or up until -- I mean, they're --

 5          THE COURT:  If they're still there.

 6          MR. FREIMANN:  So just -- just for clarification,

 7  just the members who were deployed with the plaintiff?

 8          THE COURT:  Counsel?

 9          MR. STOCKER:  Well, I asked it a little more

10  broadly --

11          THE COURT:  I understand.

12          MR. STOCKER:  -- more broadly than January to

13  present.  Yeah.

14          THE COURT:  I know what you did.

15          MR. STOCKER:  Yeah.

16          THE COURT:  But if I narrowed the request, is that

17  going to get you what you need?  I mean, essentially what you

18  want to know is to what extent he was treated differently

19  than other Scorpion team members, aren't you?

20          MR. STOCKER:  Correct.  Correct.

21          THE COURT:  All right.  So why can't we limit this

22  to the Scorpion team members?

23          MR. STOCKER:  I'll agree to that.

24          THE COURT:  Okay.  15.  Produce a résumé or

25  curriculum vitae for each of the following.  I mean, I --

Page 61

1  these names obviously don't mean anything to me.  So I am --

2  I'm somewhat at a loss to immediately see the relevance.  I

3  assume some of these folks are team members.  The documents

4  containing personal information concerning other contractors

5  are independent.  They're confidential and private.  You've

6  got a protective order in place.

7          MR. FREIMANN:  We just don't see the relevance,

8  Your Honor, to this, what their résumé or CV have anything to

9  do with the claims that plaintiff has made.

10          THE COURT:  I guess I can't -- at this point I

11  can't -- and, again, I don't recognize a lot of these names

12  so I'm somewhat at a loss in terms of dealing with relevance.

13  But certainly at least as to the team members I can see some

14  potential relevance.

15          MR. STOCKER:  Your Honor, these -- these --

16          MR. FREIMANN:  A lot of these people are

17  executives at MVM.  We have a CEO on here, and I think a CFO,

18  and other management level executives who have no

19  day-to-day -- or very limited day-to-day action with the

20  Scorpion team.

21          THE COURT:  Counsel?

22          MR. STOCKER:  These people were either on the

23  Scorpion team or in the chain of command that -- that led it.

24  And they're people that I'd like to take depositions of, and

25  I'd like a little bit of background about them.

1          THE COURT:  Yeah.  But the chief executive officer

2   of the company, why do you need his résumé?

3          MR. STOCKER:  I guess I'm trying to get a --

4          THE COURT:  Apart from curiosity --

5          MR. STOCKER:  Yeah.

6          THE COURT:  And I'll concede curiosity is a

7   motivating factor.

8          MR. STOCKER:  Well --

9          THE COURT:  But curiosity is not necessarily

10  encompassed by Rule 26.

11         MR. STOCKER:  Understood.

12         THE COURT:  Setting aside curiosity as a

13  motivation, give me the relevance of the résumé for the chief

14  executive officer.

15         MR. STOCKER:  Well, don't let me -- I'm trying to

16  get background on these guys before I go into their

17  depositions and -- and try to find out what -- where they

18  came from, what they did.  If I can have some insight into

19  that, that's what I'm trying to find out.  You know, the

20  defendants are saying Boone had no background in PSD.  I

21  don't know if these other people did either.  I guess I'm

22  trying to find out.

23         THE COURT:  I'll require you to produce the

24  résumé.  I would -- I would, if push came to shove, require

25  you to produce résumés or curriculum vitae for the team

Page 63

1  members.  I don't see the relevance of anything beyond that.

2          Number 16.  Produce all documents extending the

3  term or modifying in any way any independent contract

4  agreement signed.  Again, I would do that -- limit that to

5  team members.

6          And then Number 17.

7          MR. STOCKER:  You're referring to the Scorpion

8  team, aren't you?

9          THE COURT:  Yeah.  Produce all documents related

10  in any way to any background check performed by or for MVM on

11  any of the following.  And these, I guess, are team members.

12          MR. STOCKER:  Those are all team members.  Yeah.

13          THE COURT:  They object to this request as not

14  relevant, it's not reasonably calculated to lead, second,

15  this request is unduly burdensome, third, the documents

16  contain personal information.  I would tell you probably to

17  produce that and the reason I'm saying that is at some point

18  apparently there was a dispute between Mr. Boone and other

19  team members as to this incident with the IED and the after

20  action report.

21          MR. FREIMANN:  Correct.

22          THE COURT:  As I understand it, at some point MVM

23  chose to believe the five team members and to discount the

24  information provided by Mr. Boone.

25          MR. FREIMANN:  They went with the -- the majority.

 1   Yes, sir.

 2          THE COURT:  Sure.  And it seems to me that -- that

 3   their decision to go with these five guys versus Mr. Boone

 4   has some bearing.  I mean, they made a credibility

 5   assessment.  They found that these five individuals were more

 6   credible, at least in terms of this particular incident, than

 7   Mr. Boone.  The background information that they had on these

 8   other team members might be relevant for purposes of that

 9   credibility assessment.

10          MR. STOCKER:  Well --

11          THE COURT:  So, for instance, if they knew that

12   Mr. Boone was an Eagle Scout, and they knew that the other

13   five guys had felony, criminal records as long as their arm,

14   it might raise into question the credibility assessment that

15   they made, mightn't it?  And since credibility is

16   discoverable for purposes of Rule 26(b)(1), I don't know that

17   Number 17 is -- you know, either not relevant or not likely

18   to lead to the discovery of admissible evidence.  So I -- if

19   it were me, I would produce documents responsive to 17.

20          And I think that takes care of the entire list.

21   Is there anything else for us to discuss?  What I'm

22   suggesting is this:  I would suggest that -- well, first of

23   all, to the extent that I'm suggesting that the defendant

24   needs to produce more information, how much time are you

25   going to need to produce that information?

Page 65

```
 1           MR. FREIMANN:  Well, I guess it depends on the --
 2   it would vary.  It depends on what some of the requirements
 3   were.  I know some of the -- if we have to go, for example,
 4   to contact the client, who we don't even know who it is, that
 5   might take significantly more time to track that down versus
 6   just calling the client and see what they have in their
 7   filing cabinets, so --
 8           THE COURT:  Well, you mean MVM?
 9           MR. FREIMANN:  Well, the -- when I say the client,
10   I mean --
11           THE COURT:  Do you mean the underlying government
12   agency who hired MVM to hire these people?
13           MR. FREIMANN:  Yes, sir.  That --
14           THE COURT:  Right.
15           MR. FREIMANN:  -- that might take significantly
16   more time.  Obviously we can call our clients and have them
17   track that information.
18           THE COURT:  What I would suggest you do is this:
19   I would -- I would suggest that within 30 days you produce
20   all -- you supplement your discovery responses, produce all
21   responsive documents that are in your particular client,
22   MVM's possession, custody or control.  You also advise
23   plaintiff's counsel what steps, if any, you or MVM has taken
24   to obtain documents that are in their possession, custody or
25   control from the underlying client.  Now, my suspicion is if
```

Page 66

1   the underlying client won't even disclose who it is, they're

2   probably likely to tell MVM, pound sand.  MVM is only

3   required to produce documents that are in its possession,

4   custody or control, or documents for which it has a legal

5   right to obtain access.  I'm not sure this is going to be as

6   big of a problem as you make out.  But within 30 days you

7   either have to supp -- you must supplement your discovery

8   responses or -- and you must supplement and you must clearly

9   indicate to plaintiff's counsel whether you have produced all

10  the documents in your possession, custody or control, or what

11  steps your -- your client has undertaken to obtain documents

12  from a government agent, and how long it's going to take to

13  obtain those additional documents.  Okay?

14          MR. FREIMANN:  Yes, sir.

15          THE COURT:  But I want you to produce something

16  within 30 days.  Don't wait for this mysterious government

17  agency to make a decision.  Okay?

18          MR. FREIMANN:  Yes, Your Honor.

19          THE COURT:  Now, is there anything else we have to

20  talk about?

21          MR. STOCKER:  Your Honor, there's -- there's a --

22  if you look on this third page of the joint submittal that we

23  gave to you in preparation for today, there's requests and

24  interrogatories, and what have you, that we've agreed to

25  either --

Dave A. Boone vs.                                    Discovery and Status Conference
MVM, Inc.                                                          June 28, 2006

Page 67

1          THE COURT:  Yeah.  If you've agreed to consult

2    further, I don't need to talk about further consults.

3          MR. STOCKER:  Well, I'm just trying to get a

4    deadline for getting those things resolved, too.  And I'd

5    like that to be included in your 30 days.

6          THE COURT:  Well, I mean, the problem I've got is

7    this:  If you can agree on some of these other issues, I'll

8    expect you to, consistent with that agreement, produce within

9    30 days.  If you can't agree on these other issues, I'm sure

10   I'll have an opportunity to see you again.

11         MR. FREIMANN:  We will consult with our client our

12   responsibilities within that 30 days.

13         THE COURT:  Okay.

14         MR. FREIMANN:  I know plaintiff has some

15   obligations on his end as well to modify or supplement

16   interrogatories or request for production.

17         THE COURT:  Anything else?

18         MR. STOCKER:  No, Your Honor.

19         THE COURT:  All right, gentlemen, thanks for

20   coming in.

21         MR. STOCKER:  Thank you.

22         (Whereupon, the within hearing was then in

23   conclusion at 10:32 a.m.)

24

25

Page 68

```
 1          I certify that the foregoing is a correct

 2   transcript, to the best of my knowledge and belief (pursuant

 3   to the quality of the recording) from the record of

 4   proceedings in the above-entitled matter.

 5

 6

 7

 8   /s/ Laurel S. Tubbs                    November 5, 2015

 9   Signature of Transcriber               Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```